## H. D. & J. K. CROSSWELL, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

.Docket Nos. 7341, 10586. Promulgated May 12, 1927.

1. The Board will disregard a question discussed orally at the hearing or on brief, when not pleaded in the original petition or raised by proper amendment thereto.

2. Personal service classification denied.

*Adrian C. Humphreys, Esq.,* for the petitioner.
*J. Arthur Adams, Esq.,* for the respondent.

These proceedings are for the redetermination of deficiencies in income and profits tax in the amounts of $5,728.70 for 1918, $14,-837.13 for 1919, and $4,116.84 for 1920. The errors alleged are the denial of personal service classification and the refusal to compute the petitioner's profits tax under section 328 of the Revenue Act of 1918, after having held that the petitioner was not a personal service corporation.

### FINDINGS OF FACT.

In 1903 J. K. and H. D. Crosswell purchased, from one Lucy D. Douglass for $5,500 cash, a contract conveying certain rights in regard to the bottling and selling of Coca-Cola within certain territorial limits and formed a partnership for the exploitation thereof. The brothers advanced .the cash necessary to purchase the contract, in equal amounts. The work on the outside was done by J. K. Crosswell, who was on the road at that time selling groceries on a commission basis. In 1905, J. K. Crosswell gave up his grocery

line and devoted his time to the Coca-Cola business. H. D. Crosswell looked after office detail, billed the customers, received checks, made monthly settlements under their contract, and supervised the general affairs of the business. In 1911 H. D. Crosswell died and his one-half interest was taken over by his widow, who performed the duties previously handled by her husband.

From the inception of the business until 1915 no salaries were paid to the Crosswells, the profits of the business being divided equally, between them at irregular intervals. The widow shared the profits on the same basis as her husband had prior to his death. The gross income of the partnership from 1904 through 1914, without deducting expenses or compensation of the partners, was as follows:

| | | | |
|---|---|---|---|
| 1904 | $3,725.53 | 1910 | $17,095.25 |
| 1905 | 5,630.55 | 1911 | 21,423.03 |
| 1906 | 9,111.92 | 1912 | 28,304.18 |
| 1907 | 10,842.69 | 1913 | 37,283.75 |
| 1908 | 10,772.58 | 1914 | 36,842.10 |
| 1909 | 13,396.97 | | |

The partnership kept no record of actual expenses during these years, but paid expense items as they were incurred. The office rent amounted to approximately $400 per year, bookkeeping costs amounted to $300 per year, and miscellaneous expenses aggregated another $300 per annum. The petitioner had no plant or equipment to be maintained. The office equipment consisted of such articles as a desk, file cases, and equipment necessary to maintain an office.

In 1915, the petitioner was incorporated, under the laws of South Carolina, to take over the partnership business, with a capital stock of $5,000, par value $100 per share. The stock was issued for the contract and good will, the shares being divided equally between the two stockholders. The business was conducted by the corporation in the same manner as formerly. The duties of the former partners were unchanged in their new capacity as stockholders. However, after incorporating, salaries were paid the two stockholders in the following amounts:

| | | | |
|---|---|---|---|
| 1915 | $3,300.00 | 1918 | $15,000.00 |
| 1916 | 3,600.00 | 1919 | 19,000.00 |
| 1917 | 11,000.00 | 1920 | 19,000.00 |

The net income of the petitioner for the same years was:

| | | | |
|---|---|---|---|
| 1915 | $25,789.98 | 1918 | $17,606.00 |
| 1916 | 38,288.27 | 1919 | 41,689.39 |
| 1917 | 36,520.64 | 1920 | 17,345.87 |

On February 19, 1917, the Douglass contract was surrendered and a new agreement substantially the same, was entered into between

the petitioner and The Coca-Cola Bottling Co. of Atlanta, Ga., hereinafter referred to as the Atlanta Company.

The pertinent provisions of said contract are:

Party of the first part does hereby select party of the second part as its sole and exclusive customer and licensee for the purpose of bottling and selling the Bottlers' syrup Coca-Cola, in the territory heretofore acquired by said party of the second part.

     \*     \*     \*     \*     \*     \*     \*

Party of second part agrees  \*  \*  \*

(d) To buy of or through said first party all Coca-Cola syrup required or used by said second party in the preparation for market of its bottled goods aforesaid, and at the price of $1.20 per gallon delivered at any point in the above mentioned territory, where a bottling plant is established by party of the second part, or by any sub-bottling contractors under contract with party of second part, the purchase price of said syrup to accompany all orders for same; or if cash does not accompany said order, then party of the first part is to have the right to draw on party of the second part, with bill of lading attached.  \*  \*  \*

The principal change was a provision requiring bottlers to use a patented Coca-Cola bottle and a distinctive crown for capping the bottles.

The petitioner did not bottle Coca-Cola, but entered into contracts with others granting them the right to bottle and sell all Coca-Cola in a part of its territory. The subcontracts were similar to the principal contract between petitioner and the Atlanta Company except that the price to be paid the petitioner by the subcontractors was $1.40 a gallon for the syrup, except in those cases where the subcontractor ordered direct, when the price was $1.35. In the case of two or three small bottlers the syrup was sold at $1.50 a gallon. Petitioner had arrangements with certain plants to order direct from Atlanta. In those cases the shipments were made direct and the billing was done by the Atlanta Company to the subcontractors, who paid direct to the Atlanta Company, which credited the differential to the petitioner. When the orders came through the petitioner, it received the bills from the parent company and billed the subcontractors. The petitioner generally collected its bills before remitting to the Atlanta office. It did not keep any syrup on hand, and did not buy any until it had received an order from a subcontractor.

Under the subcontracts, 28 bottling plants were in operation. The petitioner was responsible for the product which was being bottled and sold as Coca-Cola. As a result, J. K. Crosswell visited those plants once or twice a month, inspecting them as to sanitary conditions and the bottled product, offered suggestions for increasing business, checked up the bottler with respect to the terms of his contract, solicited orders for additional syrup, and pushed the business by advertising and personal effort. The advertising was provided for by the principal contract, a provision of which allowed the peti-

tioner 10 cents per gallon on each gallon of syrup purchased from the Atlanta Company.

In addition to being president of the petitioner, J. K. Crosswell was also president of a wholesale grocery concern located at Sumter, S. C. He lived in Sumter, while the petitioner's office was in Columbia, S. C. The trip from Sumter to Columbia, or vice versa, required approximately an hour by auto or train. His duties with the wholesale business consisted of presiding at meetings, the active management being carried on by the other officers.

Mrs. Crosswell devoted part of her time to other business interests. She was president of the Coca-Cola Bottling Co. of Columbia; its office and that of the petitioner were located in the same building, adjoining one another. She devoted her time to the interests of both concerns, but in what proportion does not appear. Her duties with the petitioner were to supervise and manage the office. She had an assistant, employed on a part-time basis, who was also employed in her other enterprise. The principal part of the office work consisted of keeping the books, receiving orders, forwarding them for shipment and delivery by the Atlanta Company, billing customers, receiving their remittances or orders, making monthly settlements with the Atlanta Company, and handling the usual details incident to an office.

During the period 1904 to 1920, with the exception of a period of several months beginning in November, 1919, and ending some time in 1920, the commissions which the petitioner received were practically constant. The commissions varied in the last two months in 1919 and through a part of 1920 because of economic and business conditions and shortage of sugar. During these months, the Atlanta Company, the petitioner, and the subcontractors by mutual agreement waived their contract prices, so that commissions, costs, and selling prices varied with the economic conditions and were not constant.

The following table shows the business done by the petitioner during each of the taxable years:

|  | 1918. | 1919. | 1920. |
|---|---|---|---|
| Coco-Cola Bottling Co. billed direct to customer | $101, 549. 45 | $158, 661. 10 | |
| Cost | 90, 078. 00 | 140, 745. 60 | |
| Gross income to taxpayer | 11, 471. 45 | 17, 915. 50 | $15, 010. 99 |
| Coco-Cola Bottling Co. billed taxpayer and taxpayer billed customer | 167, 408. 40 | 345, 710. 40 | 399, 715. 40 |
| Cost | 143, 507. 20 | 300, 199. 70 | 374, 326. 84 |
| Gross income to taxpayer | 23, 901. 20 | 45, 510. 70 | 25, 388. 56 |

The gross income, expenses, and net profits for the taxable years were:

### 1918.

Gross income:

| | | |
|---|---|---|
| Income from sales | | $35,372.65 |
| Interest received | | 120.09 |
| Miscellaneous receipts | | 2.48 |
| **Gross income** | | 35,495.22 |

Expenses:

| | | |
|---|---|---|
| Salary, secretary (nonstockholder) | $1,000.00 | |
| Rent | 600.00 | |
| Traveling expenses | 350.00 | |
| Miscellaneous | 129.22 | |
| J. K. Crosswell | 8,000.00 | |
| S. W. Crosswell | 7,000.00 | |
| City, state and county taxes | 810.00 | |
| | | 17,889.22 |
| **Net profits** | | 17,606.00 |

### 1919.

Gross income:

| | | |
|---|---|---|
| Income from sales | | 63,426.20 |
| Interest received | | 426.67 |
| **Gross income** | | 63,852.87 |

Expenses:

| | | |
|---|---|---|
| Salary, secretary (nonstockholder) | $1,050.00 | |
| J. K. Crosswell | 10,000.00 | |
| S. W. Crosswell | 9,000.00 | |
| Rent | 600.00 | |
| Taxes | 918.50 | |
| Traveling expenses | 531.27 | |
| Miscellaneous | 63.71 | |
| Total expenses | | 22,163.48 |
| **Net profits** | | 41,689.39 |

### 1920.

Gross income:

| | | |
|---|---|---|
| Income from sales | | 40,399.55 |
| Interest received | | 65.25 |
| **Gross income** | | 40,464.80 |

Expenses:

| | | |
|---|---|---|
| Salary, secretary (nonstockholder) | $1,400.00 | |
| J. K. Crosswell | 10,000.00 | |
| S. W. Crosswell-Lumpkin | 9,000.00 | |
| Rent | 600.00 | |
| Traveling expenses | 775.43 | |
| Telephone and telegrams | 142.11 | |
| Printing | 29.65 | |
| Auditing | 244.30 | |
| Taxes | 837.00 | |
| Miscellaneous | 90.44 | |
| Total expenses | | 23,118.93 |
| **Net profits** | | 17,345.87 |

The assets and liabilities of the petitioner from 1917 to 1920, as shown by its balance sheets, were:

| Assets. | Dec. 31, 1917. | Dec. 31, 1918. | Dec. 31, 1919. | Dec. 31, 1920. |
|---|---|---|---|---|
| Cash in bank | $13,042.97 | $13,817.91 | $6,491.30 | $7,843.64 |
| Accounts receivable | 10,926.85 | 13,596.05 | 21,366.74 | 23,368.37 |
| Advance to shareholders | | 100.00 | | |
| Good will | 30,000.00 | 30,000.00 | 30,000.00 | 5,000.00 |
| Total assets | 53,969.82 | 57,513.96 | 57,858.04 | 36,212.01 |
| LIABILITIES. | | | | |
| Accounts payable | 10,030.25 | 11,663.41 | 20,018.10 | 22,326.20 |
| Difference | 1.88 | | | |
| | 10,032.13 | | | |
| Accrued traveling expense | | | 300.00 | |
| Capital stock | 30,000.00 | 30,000.00 | 30,000.00 | 5,000.00 |
| Surplus | 13,937.69 | 15,850.55 | 7,839.94 | 8,885.81 |
| Total liabilities | 53,969.82 | 57,513.96 | 57,858.04 | 36,212.01 |

On July 17, 1917, the capital stock of the petitioner was arbitrarily written up from $5,000 to $30,000, the write-up being credited against good will. On December 29, 1920, the petitioner arbitrarily reduced capital stock to the original $5,000. The additional stock while outstanding was held equally by J. K. Crosswell and Mrs. H. D. Crosswell.

The petitioner filed returns for the taxable years in question as a personal service corporation. The Commissioner disallowed such classification, denied special assessment on the ground that its profits tax was not in excess of the average profits tax of representative concerns, and computed its profits tax under 302 of the Revenue Act of 1918.

OPINION.

MORRIS: The pleadings present but two issues for our determination—(1) whether the petitioner is entitled to personal service classification; (2) if such classification is denied, whether its profits tax should be computed under section 328. At the hearing and by brief, counsel for the petitioner suggested that if personal service classification is denied, then the actual value of its contract with the Coca-Cola Bottling Co. as of the date of incorporation, should be included in invested capital, but no motion to amend the petition so as to include this issue therein was made. The primary purpose of pleadings is the joinder of issues between the parties. Issues attempted to be raised by brief, or orally at the hearing, will be disregarded. *Appeal of Dixie Manufacturing Co.*, 1 B. T. A. 641; *Appeal of W. P. Weaver*, 2 B. T. A. 709.

The principal contention of the petitioner is its claim for personal service classification. Where a corporation seeks benefits conferred

by the statute, it must bring itself within its provisions. One of the requirements for a personal service classification is that capital shall not be a material income-producing factor. The actual investment in the business in 1903 by the partners was $5,500. The table of gross earnings shows the development of the vending of bottled Coca-Cola in the territory in which petitioner had the contractual rights. By 1915, this contract had become very valuable, due to a large extent to the efforts of the partners, and could no doubt have been sold for a most substantial profit. Just what the actual value of the contract was at the time the same was turned in for stock, we are unable to state. Only $5,000 of capital stock was issued for the contract and good will in 1915, whereas the contract alone had been purchased in 1903 for $5,500 cash. Between 1903 and 1915 the partners had netted substantial profits through the subcontracts which they had secured for the bottling and selling of Coca-Cola in the territory covered by their principal contract. Their principal asset was the contract under which they were assigned the right to bottle and vend Coca-Cola. They did no bottling or vending of Coca-Cola themselves. Their services consisted in seeing that the contracts were carried out and in advertising and pushing bottled Coca-Cola. Such personal services as they rendered were for the purpose of further capitalizing their contract. Their profits were limited only to the extent which they were able to exploit the contract within their prescribed territorial limits. There can be no doubt, therefore, that this contract constituted capital, that it had value in 1915 much in excess of its original cost; and that it was a material income-producing factor.

Under the contract the petitioner agreed to buy Coca-Cola syrup from the Atlanta Company at $1.20 per gallon which it sold to its subcontractors at prices ranging from $1.35 to $1.50. The differential constituted the petitioner's profits. In other words it is the difference between what the syrup cost and what it sold for that made the operating profit. Under such circumstances it is our opinion that the petitioner was dealing as a principal. Considering only the syrup which the petitioner ordered, however, the facts show that the gross income therefrom exceeded that from the syrup ordered by the subcontractors directly from the Atlanta Company, the figures for the years in question being for 1918, $23,901.20 and $11,471.45, respectively; for 1919, $45,510.70 and $17,915.50, respectively; and for 1920, $25,388.56 and $15,010.99, respectively. To the extent of that business at least there can be no question but that the petitioner was dealing as a principal, and therefore not entitled to personal service classification, as 50 per cent or more of its gross income was derived therefrom.

The remaining contention of the petitioner is that it should be granted special assessment. We find no evidence in the record of an abnormality. The only evidence from which such a finding could be inferred is the statement of earnings and a comparison of the .same with the capital invested, but large profits from a small amount of capital invested is not such an abnormality as is contemplated in the statute.

It also appears that the Commissioner made a comparison with representative concerns and found that the rate of profits tax computed under the provisions of section 302 of the Revenue Act of 1918 is less than that paid by such representative concerns. The petitioner offered no comparatives so we are unable to determine what relief, if any, it would be entitled to, if its profits tax were computed under section 328 of the Revenue Act of 1918.

*Judgment will be entered for the respondent.*