PROFESSIONAL SERVICES, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

EUGENE F. AND PATRICIA J. MORTON, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 2674–80, 2675–80.[1]    Filed November 23, 1982.

*Jean S. Schanen,* for the petitioner.
*Jeannette A. Cyphers,* for the respondent.

---

[1]These cases have been consolidated for purposes of trial, briefing, and opinion as to the issues decided herein.

KÖRNER, *Judge:*[*] Respondent determined deficiencies of income tax plus additions to tax under section 6653(a)[2] as follows:

| Petitioner | Year | Docket No. | Deficiency | Sec. 6653(a) |
|---|---|---|---|---|
| Eugene and Patricia Morton | 1976 | 2675–80 | $29,048 | $1,452 |
| | 1977 | 2675–80 | 88,590 | 4,430 |
| Professional Services | 1977 | 2674–80 | 40,669 | 2,033 |

By amended answers in docket No. 2675–80, respondent alleged that the underpayments attributable to Eugene and Patricia Morton for the years 1976 and 1977 were due to fraud and accordingly asserted that these petitioners were liable for additions to tax under section 6653(b) with respect to those years.

Numerous issues raised in the pleadings and amended pleadings have been conceded by the parties and can be given effect in the Rule 155 computations. After these concessions, the remaining issues for decision are as follows: (1) Whether Eugene and Patricia Morton are entitled to deduct, under section 162 or section 212, amounts they purportedly paid in 1976 to purchase certain materials relating to "business trust organizations"; (2) whether Eugene and Patricia Morton are entitled to deduct, under section 162 or section 212, amounts they paid in 1977 to purchase certain materials relating to "business trust organizations," and for assistance in establishing these organizations; (3) whether certain payments purportedly made in 1977 by Eugene and Patricia Morton to Professional Services are nondeductible either because Professional Services was totally devoid of economic substance and is therefore not entitled to be recognized for Federal tax purposes, or because the purported payments themselves were without substance; or (4) alternatively, if Professional Services represents a valid, recognizable entity for Federal tax purposes, whether Eugene and Patricia Morton are taxable on any portion of the income of that entity in 1977 under the

---

[*]These cases were tried before Judge Cynthia Holcomb Hall who subsequently resigned from the Court. By order of the Chief Judge, these cases were reassigned to Judge Jules G. Körner III.

[2]All statutory references herein are to the Internal Revenue Code of 1954 as in effect during the years in issue, and all Rule references are to the Rules of Practice and Procedure of this Court, unless otherwise noted.

grantor trust provisions of sections 671 through 677; (5) if Professional Services represents a valid, recognizable entity for Federal tax purposes, whether it is entitled to deduct, under section 162, amounts it purportedly paid in 1977 as a management fee; (6) whether Eugene Morton is liable for additions to tax under section 6653(b) with respect to his 1976 and 1977 tax years; or (7) alternatively, if Eugene Morton is not liable for additions to tax under section 6653(b), whether Eugene and Patricia Morton are liable for additions to tax under section 6653(a) for their 1976 and 1977 tax years; and (8) whether Professional Services is liable for additions to tax under section 6653(a) for 1977.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulations of facts, together with the exhibits attached thereto, are incorporated herein by this reference.

Eugene F. Morton (hereinafter referred to as petitioner) and Patricia J. Morton (hereinafter referred to as Patricia) were husband and wife during the years in issue and on the date of the filing of the petition in this case. Their legal residence on the date the petition was filed was Anchorage, Alaska. They filed joint Federal income tax returns for calendar years 1976 and 1977 with the Office of the Internal Revenue Service at Ogden, Utah. (Hereinafter, when "petitioners" is used it will refer to both petitioner and Patricia.) During the years involved herein, petitioner was a licensed dentist, practicing in Anchorage, Alaska.

Petitioner Professional Services (hereinafter Professional Services) purports to be a "business trust organization" and was created in the State of Alaska on September 2, 1977. This entity[3] filed a fiduciary income tax return (Form 1041) for its short year beginning September 2, 1977, and ending December 31, 1977, with the Office of the Internal Revenue Service at Ogden, Utah.

---

[3] The use of the following words and derivatives thereof in our findings of fact is for narrative convenience only, following the form in which the various transactions involved herein were cast, and is not intended to indicate any legal conclusions concerning the actual substance or legal effect of the transactions: "purchase," "sale," "loan," "note," "promissory note," "tax package," "trusts," "paid," "borrowed," "gift," "transfer," "contract," "liability," "entity," "business trust."

## I. 1976 Tax Year

Charles H. Bumpus and Glenn A. Huff were business associates and friends residing in Alaska. Through their investment partnership, Minn-Arctic Development Co. (MADCO herein), Mr. Bumpus and Mr. Huff were mutually involved in various real estate partnerships. They had offices in the same building and shared a single secretary. In mid–1976, Mr. Bumpus and Mr. Huff developed concerns about the effect that the death of a partner would have upon the operation of their various partnerships and consulted an attorney in an attempt to resolve these concerns. However, before Mr. Bumpus and Mr. Huff received what they considered to be satisfactory advice from their attorney in this regard, Mr. Bumpus was approached by one Hiram Conley, a representative of the American Law Association (hereinafter A.L.A.). Mr. Conley represented that there was a way for Mr. Bumpus and Mr. Huff to eliminate their income tax and estate tax liability and to avoid probate upon the death of a partner through the use of a certain kind of foreign trust organization. Mr. Conley further represented that the subject had been throughly researched by one Karl Dahlstrom, and that this information would be presented to members of A.L.A. at a 2-day seminar in mid-November 1976, for a fee of $6,600.

The prospect of achieving the above-asserted advantages was particularly attractive to Mr. Bumpus and Mr. Huff. Accordingly, through their partnership, MADCO, Mr. Bumpus and Mr. Huff joined A.L.A., paid a single seminar fee of $6,600,[4] and attended the seminar which was presented by Karl Dahlstrom in mid-November 1976 in Alaska. At the seminar, Mr. Bumpus and Mr. Huff, as MADCO partners, received one package of materials (hereinafter referred to as the tax package). The tax package included preprinted forms for establishing "business trust organizations," preprinted minutes and trust certificates, and numerous excerpts from cases, legal commentary, newspaper articles, and other materials regarding trusts.

Mr. Bumpus and Mr. Huff were very impressed by the information which was presented at the seminar. In fact, they

---

[4]This was the standard fee charged for the Dahlstrom seminar.

decided that they would disseminate the information they received at the seminar to all of their partners and partnerships so that they could alter their organizational format and henceforth conduct their affairs in the form of "business trust organizations," rather than partnerships. Mr. Bumpus wanted this structural change to occur by January 1 of the following year in order to avoid complexities which might arise from a mid-year closing of the partnerships' books.

Mr. Bumpus and Mr. Huff decided that the best method by which the tax package materials could be disseminated to their partners and partnerships was through the utilization of their newfound knowledge relating to foreign business trust organizations. Accordingly, shortly after the Dahlstrom seminar in November 1976, they traveled to the country of Belize (formerly British Honduras). They took with them the numerous forms for establishing trust organizations which they received as part of the tax package. While in Belize, Mr. Bumpus and Mr. Huff arranged for documents to be executed which purported to establish a number of trust organizations, over some of which Mr. Bumpus intended to, and did, exercise complete control, and over others of which Mr. Huff intended to, and did, exercise complete control. The trust organizations over which Mr. Bumpus exercised complete control were named Continental Trust Association (hereinafter Continental), Worldwide Marketing & Tax Consultants (hereinafter Worldwide), and Greenwich Trust (hereinafter Greenwich). The trust organizations over which Mr. Huff exercised complete control included Universal Trust Association (hereinafter Universal), International Tax & Business Consultants (hereinafter ITBC), and Zurich Trust (hereinafter Zurich).

Upon the formation of these organizations, Mr. Bumpus purportedly transferred the tax package materials to Worldwide, while Mr. Huff purportedly transferred the same materials to ITBC. Thus, the tax package materials purportedly formed part of the corpus of one entity controlled by Mr. Bumpus, and one entity controlled by Mr. Huff.

Having thus established these organizations, Mr. Bumpus and Mr. Huff returned to Alaska and began to implement their plans to disseminate the tax package materials to their other partners and partnerships through their newly created foreign organizations. Additionally, the tax package materials

were made available to certain individuals who were not partners in any of the various partnerships in which Mr. Bumpus and Mr. Huff were partners.

The transactions by which the tax packages were made available to the various partners, partnerships, and third parties were cast in the form of sales. The prices purportedly paid for the tax package by each purchaser varied as follows:

| Purchaser | Price |
|---|---|
| Woody Lake Estates partnership | $6,725 |
| Knollwood Heights partnership | 17,800 |
| Big Lake Heights partnership | 23,000 |
| Blair Estate partnership | 6,750 |
| Contracting Engineers & Associates partnership | 31,800 |
| Skyline Estates partnership | 8,750 |
| Wasilla Estates partnership | 15,900 |
| Northern Lights Estate partnership | 3,600 |
| Wasilla Developments partnership | 41,900 |
| Eve Watson | 8,750 |
| George Simon | 17,800 |
| Charles E. Bumpus | 11,000 |
| Ralph Jokela | 14,500 |
| Norville Rich | 10,675 |
| Johnson Investments or Eugene Johnson | 31,800 |
| Johnson Investments or Eugene Johnson | 26,500 |
| Charles Bumpus Real Estate | 10,675 |
| Glenn A. Huff | 3,825 |
| Donald Saur | 23,000 |
| Ralph Huff | 14,500 |
| Christopher Bumpus | 8,750 |
| Eugene F. Morton | 47,400 |
| W. Kirk Marvin | 26,500 |

Either Mr. Bumpus or Mr. Huff or both were partners in each of the above-listed partnerships. Except for Eve Watson, W. Kirk Marvin, Ralph Huff, Christopher Bumpus, and petitioner, all of the above-listed individuals were partners in one of the partnerships to which Mr. Bumpus or Mr. Huff belonged.

Although each of the purchasers of a tax package received

similar materials,[5] the prices they purportedly paid for such materials, as indicated above, varied from $3,600 to $47,400. At trial, neither Mr. Bumpus nor Mr. Huff offered any credible explanation as to how these varying prices were determined.

Each purported sale of a tax package was preplanned and structured similarly.[6] A prospective purchaser would borrow the tax package purchase price from one of Mr. Bumpus' controlled entities and then buy a tax package from one of Mr. Huff's controlled entities, or vice versa, using the proceeds of the loan to pay the purchase price. Mr. Bumpus and Mr. Huff were careful to structure each purported purchase so that a tax package would not be purchased from the same or commonly controlled entity that loaned the purchase price to the buyer. This was done because Messrs. Bumpus and Huff thought that it would not "look right" to have a purchaser both borrow the money and purchase the tax package from entities controlled by the same individual.

At the time the loans were made to prospective purchasers of tax packages, the parties intended that the borrowers would not ultimately be required to repay the loan to the original lender. Two methods were subsequently devised by which the above preconceived plan was implemented. One method was applied to notes signed by the individual purchasers, while the other method was applied to notes signed by the partnerships which purchased tax packages. With respect to the former, substantially all of the individual purchaser's promissory notes were given by the lending entity to entities controlled by the individual purchaser or a relative of that purchaser. Each note signed by a partnership, on the other hand, was repaid with partnership funds. However, each of

---

[5]When one of Mr. Bumpus' or Mr. Huff's related partnerships purchased a tax package, a copy of the tax package materials was not actually given to the partnership. Rather one set of the seminar materials was made available to the partnership at the office of Mr. Bumpus and Mr. Huff. However, all materials were made available to each purchasing partnership regardless of the price each paid. With respect to the individual purchasers of the tax packages, Mr. Bumpus and Mr. Huff suggested at trial that certain pages were removed from some of the packages when they were sold to these individuals. However, they failed to specify which pages were removed, and it is apparent from the record that, to the extent there was a variance in materials received by individual purchasers, that variance was insignificant.

[6]All of the purchasers involved herein, except Eugene Johnson and/or Johnson Investments, borrowed money from a Bumpus- or Huff-controlled entity to effect the purchase of their tax packages. With respect to Mr. Johnson and/or Johnson Investments, checks were exchanged on the same day with Mr. Bumpus and Mr. Huff, and the money was immediately returned to an entity controlled by Mr. Johnson.

these repayments was then immediately transferred in proportionate shares by the "lender" to entities controlled by each partner. Thus, these repayments, in fact, resulted in a distribution of partnership funds to each partner's controlled entity.

Petitioner's purported purchase of a tax package followed the structure outlined above. Petitioner first borrowed $47,400 from Greenwich (a Bumpus-controlled foreign business trust organization), and signed a promissory note, bearing interest at a rate of 8 percent, under date of December 27, 1976. Both interest and principal on this note were to fall due in December 1999. Then, pursuant to a written contract, petitioner transferred the $47,400 to ITBC (a Huff-controlled foreign business trust organization) and received the tax package materials in exchange. On April 22, 1977, the promissory note representing petitioner's indebtedness to Greenwich was transferred to Swiss International, Ltd., by Greenwich. Swiss International, Ltd., purports to be a foreign business trust organization which was created by, and entirely controlled by, petitioner.[7] In fact, the note was physically delivered to petitioner, who was the only individual authorized to act on behalf of Swiss International, Ltd., by Mr. Bumpus, who was the only person authorized to act on behalf of Greenwich. The transfer of this note to Swiss International, Ltd., was made to effectuate the parties' preconceived intention to relieve petitioner of all liability on the note to Greenwich. Petitioner in effect paid nothing for the tax package which he received in 1976.[8]

---

[7]The factual details relating to the creation of, and the operation of, Swiss International, Ltd., are discussed *infra*.

[8]Petitioner contends that he was not aware of a prearranged plan to relieve him of liability to Greenwich on this note. Petitioner effectively would have us believe that the gift of the note to his controlled entity in April of 1977 came as a complete surprise to him. We find petitioner's position inherently incredible under the facts of this case. The testimony of petitioner's own witnesses makes it clear that, prior to selling the tax packages, Mr. Bumpus and Mr. Huff intended that, one way or another, the borrowers would not have to repay the "loans" to the lending entity. That Mr. Bumpus and Mr. Huff did not communicate this obviously attractive aspect of the overall transaction giving rise to the purchase of the tax package is simply not believable, especially when considered in light of the fact that petitioner's tax package purchase price was $43,475 in excess of the lowest price charged by Mr. Bumpus and Mr. Huff for the tax package. Moreover, although petitioner contends that he truly owes and intends to repay the loan of $47,400, he did not list this amount as a liability of his on any of the three financial statements he prepared for banks in attempting

On his 1976 tax return, petitioner deducted the $47,400 purportedly paid for the tax package as legal and professional fees. Petitioner signed his 1976 return on May 21, 1977, which was after the date (April 22, 1977) when the note for this amount had been returned to him, ostensibly acting for Swiss International, Ltd. (see note 7 *supra*). Petitioner claimed said deduction fraudulently, with intent to evade part of his 1976 tax. In his statutory notice of deficiency, respondent disallowed this deduction on the ground that petitioner had neither established that such amounts were ordinary and necessary business expenses nor that such amounts were actually expended for the purpose designated. Additionally, respondent determined that petitioners were liable for additions to tax under section 6653(a). By way of amended answers, respondent now contends that petitioner is liable for additions to tax under section 6653(b) and only alternatively contends that petitioners are liable for additions to tax under section 6653(a).

## II. 1977 TAX YEAR

In late December 1976, Mr. Bumpus and Mr. Huff created another business trust organization called ATES and established themselves as co-trustees. Apparently, ATES was created as a vehicle through which Mr. Bumpus and Mr. Huff could market the tax package materials to interested parties, as well as provide such purchasers with other assistance relating to business trust organizations. Mr. Bumpus and Mr. Huff then formulated the package which was later marketed through ATES. This package (hereinafter referred to as the ATES package) was made available for purchase at a cost of $11,000. Mr. Bumpus and Mr. Huff, as co-trustees of ATES, established an office and hired Wesley J. Milton, an accountant, to assist purchasers of ATES packages with any problems which might develop after their purchases.

In January 1977, petitioner paid $11,000 to ATES for the

---

to secure personal loans in 1978, 1979, or 1981. Two of these financial statements were submitted by petitioner as "full, true and correct statement[s] of his financial condition on the date stated." The other financial statement was submitted as "true and represent[ing] a total disclosure of all information requested." Nor did petitioner list this amount as a liability on the divorce petition which he filed with the Alaska Superior Court on Dec. 5, 1980.

ATES package. This $11,000 price purchased for petitioner copies of all of the tax package materials and forms which he had purportedly purchased from ITBC for $47,400 in December of 1976 as set out hereinabove. The price additionally included membership in A.L.A. travel expenses to Houston, Tex., a Dahlstrom seminar,[9] travel expenses to Belize, and assistance in establishing and maintaining trust organizations, as well as return expenses to Alaska.

Mr. Bumpus and Mr. Huff escorted their first group of ATES package purchasers to Houston, Tex., and on to Belize in early 1977. This group consisted of 10 or 11 people, and included petitioner.

On February 1, 1977, while in Belize, petitioner executed preprinted documents that he had received as part of the ATES package, which purported to establish three business trust organizations. Petitioner named these newly created organizations Professional Management Organization (hereinafter referred to as Professional Management); Swiss International, Ltd. (hereinafter referred to as Swiss International); and National Service Organization (hereinafter referred to as National Service).

The documents which purportedly created Professional Management name petitioner as trustee of that entity. The same documents recite that petitioner, on February 1, 1977, transferred $100 to Professional Management in exchange for 100 "trust certificate units." These documents also list one Julian Thompson as "creator" of the organization, and list petitioner as "transferor." On the same day, petitioner then purported to transfer the 100 trust certificate units of Professional Management to Julian Thompson, who held the certificates thereafter as nominee for petitioner.[10]

---

[9]Apparently, Mr. Dahlstrom resided and kept his office in Houston, Tex. A portion of each $11,000 purchase price was transferred to Mr. Dahlstrom by Mr. Bumpus and Mr. Huff as a seminar fee. Mr. Bumpus and Mr. Huff apparently made a deal with Mr. Dahlstrom that ATES would be charged between $2,100 and $3,100 less than the customary $6,600 seminar fee for each person whom ATES brought to a seminar. The record does not show the portion of the $11,000 attributable to A.L.A. membership, nor the benefits received therefrom.

[10]All of the documents which purport to create the three organizations under discussion list Julian Thompson as their creator, and further list Mr. Thompson as the individual who appointed the trustees of the respective entities. However, Mr. Thompson did not transfer anything to the trusts, and it is clear from the record that Mr. Thompson merely signed his name to these documents at the request of petitioner. Mr. Thompson appears to have been a

The documents which purport to create Swiss International list Professional Management as the "transferor." These documents name Professional Management as first trustee of Swiss International and also recite that Professional Management transferred $50 of the $100 it had received upon its creation, to Swiss International in exchange for 100 Swiss International trust certificate units. On the same day that this entity was created, petitioner, acting as trustee of Professional Management, appointed Swiss International "advisory trustee" of National Service (the third trust organization established by petitioner on February 1, 1977, as set out below). This document recited that Swiss International would receive $10,000 per year as compensation for services to be rendered to National Service as advisory trustee.

The documents which purport to establish National Service name Professional Management as first trustee of that entity. Petitioner ostensibly transferred $200 to National Service and received 100 trust certificate units in exchange. Simultaneously, petitioner purported to give the 100 trust certificate units to Swiss International.[11]

The preprinted documents which purportedly established these three business trust organizations each provided:

The named Trustee(s), for themselves and their successors in trust irrevocable do hereby accept the conveyance and acknowledge delivery of all the property specified, together with all the terms of the Trust Organization herein set forth, agreeing to conserve and improve the Trust Organization, to invest and reinvest the funds of said Trust Organization, in such manner as will increase the financial rating of the Trust Organization exercising their best judgment and discretion, in accordance with the Trust minutes, making distribution of portions of the proceeds and income as in their discretion, and according to the minutes, and upon the final liquidation. distributing the assets to the existing certificate holders as their contingent rights may appear; and in all other respects administering said Trust Organization in good faith, strictly in conformity hereto.

---

tourist guide or taxi cab driver in Belize who drove the Bumpus and Huff group from the airport in Belize to the place the trust documents were executed. His participation in executing the trust documents appears to be without any real significance except, perhaps, to comply with the technical requirements of Belize law concerning the creation and organization of trusts. Thus, actions ostensibly taken by Mr. Thompson as "creator" of these trusts will be treated as if they were, in fact, taken by petitioner.

[11]Throughout this complicated paper trail, no party in interest was involved, other than petitioner.

The named trustees (i.e., petitioner) of these organizations could be removed only by a unanimous resolution of the board of trustees,[12] or by a court. The trustees were empowered to appoint or elect successor trustees upon the death or removal of another trustee by unanimous vote of the remaining trustees.

The trustees were provided with extremely broad powers over the trust. Each trust instrument provided:

Trustees' powers shall be construed as general common-law powers of citizens of the Country of Belize, Central America to do anything any citizen may do in any state or country. They shall, but not be limited to continue in business, conserve the property, commercialize the resources, extend any established line of business in industry or investment, as herein specially noted, at their discretion for the benefit of this Trust Organization such as, viz: buy, sell or lease land for surface or mineral rights; buy or sell mortgages, securities, bonds, notes, leases of all kinds, contracts or credits of any form, patents, trademarks or copyrights; buy, sell, or conduct mailorder [sic] business, or branches thereof; operate stores, shops, factories, warehouses, or other trading establishments or places of business of any kind; allocate funds derived from any source for charity, religion, education, research, accumulating or other purposes, whether for immediate or future application to be managed by specified Trustee, Trustees, or others as designated by the Trustee's minutes; construct, buysell, [sic] or lease or rent any type of real estate, improved or unimproved; advertise different articles of business projects; borrow money for any project, pledging the Trust Organization property for the payment thereof; hypothecate assets, property, or both; own stock in, or entire charters of corporations, or other properties, companies or associations as they may deem advantageous.

Resolutions of the Board of Trustees authorizing a special thing to be done shall be evidenced [sic] that such act is within its power. Anyone lending or paying money to the Board of Trustees shall not be obligated to see the application thereof. All funds paid into the treasury are and become a part of the corpus of the Trust Organization.

As to its duration and termination, each trust instrument provided:

This Trust Organization shall continue for a period of twenty-five years from date, unless the Trustees shall unanimously determine upon an earlier date. The Trustees may at their discretion, because of threatened depreciation in values, or other good and sufficient reason, liquidate the assets, distribute and close the Trust Organization at any earlier date determined

---

[12] In other words, no matter how many trustees, petitioner could not be removed by action of the trustees without his consent.

by them. The Trust shall be proportionately and in a pro rata manner distributed to the Certificate Holders.

The rights of the certificate holders of each of the business trust organizations were defined as follows:

Ownership of certificates shall not entitle the holder to any legal title or equitable title in or to the Trust Organization property, nor any undivided interest therein, nor in the management thereof, nor shall the death of a holder entitle their [sic] heirs or legal representatives to demand any partition or division of the property of the Trust Organization, nor any special accounting. The rights of the certificate holders in personam are limited to merely a claim against the trustees to carry out this Declaration of Trust.

Petitioners returned to Alaska from Belize on February 2, 1977. The above three organizations remained dormant until September 1977. At all times since the execution of the documents purportedly creating the organizations, all trust records and assets have been kept under petitioner's control in Alaska.

In September of 1977, petitioners executed documents which purportedly established, under Alaska law, two more business trust organizations. The documents creating these new entities were executed in Anchorage, Alaska, and the entities were named Professional Services and Alaska Rentals. The trustees' powers and the trusts' durations as well as the rights of the certificate holders, were substantially similar to those of petitioners' three previously created trusts, except that, under these documents, the broad trustees' powers were to be construed as general common law powers of citizens of the United States, rather than citizens of Belize.

According to the documents which purportedly created Alaska Rentals, petitioner was named first trustee of that entity and his wife, Patricia, was named second trustee.[13] Petitioner and Patricia then named petitioner "executive trustee" of Alaska Rentals. Additionally, this document indi-

---

[13]The documents which purport to establish Alaska Rentals and Professional Services list Wesley Milton, petitioner's accountant, as the "creator" of those two trusts. However, just as Julian Thompson, the purported creator of the trusts established by petitioner in Belize, did not transfer anything to those trusts (see note 10 *supra*), neither did Mr. Milton transfer anything to Professional Services or Alaska Rentals. The record makes it clear that Mr. Milton was acting as a mere agent or nominee of petitioner in signing his name to these documents. Accordingly, actions ostensibly taken by Mr. Milton as "creator" of these trusts will be treated as they were, in fact, taken by petitioner.

cates that petitioner transferred $100, together with some real property and certain partnership interests, to Alaska Rentals, loaned it $15,000, and received 100 trust certificate units in exchange.

On September 2, 1977, petitioner executed documents which purported to create Professional Services. These documents name petitioner and his wife, Patricia, as first and second trustees, respectively. Petitioner and Patricia then named petitioner executive trustee of this entity. These documents indicate that, on September 2, 1977, petitioner transferred all of the dental equipment and supplies that he used in his practice of dentistry, as well as the real property used by petitioner as his dental office, to Professional Services. The conveyance of the real property is evidenced by a quitclaim deed, executed on September 2, 1977. However, this transfer was not recorded until late in 1979.

In exchange for the above-purported transfers, petitioner received 100 Professional Services trust certificate units. On the same date, petitioner purportedly transferred 50 of those units to Patricia.

Although petitioner and Patricia were named first and second trustees, respectively, of both Alaska Rentals and Professional Services, petitioner exercised exclusive control over both of these entities, since he was also named executive trustee of these entities, and the respective trust instruments each provided that:

The Executive Trustee shall have the sole authority acting in behalf of all other Trustees. This authority includes the power to execute contracts of any description, buy and sell property of all kinds, direct the management concerning any affair that will benefit the trust or any other powers provided for in the Trust Indenture.

The avowed purpose of the trust was to—

provide for a sane and economical administration by natural persons acting in a fiduciary capacity, to begin at once and that the Trustees act solely within their constitutional rights as based upon their common law rights and immunities vouchsafed to citizens of the United States of America and defined in Article IV, Section 2, providing that "Citizens of each state shall be entitled to all privileges and immunities of citizens in several states:" and Article VI, Section 2, providing that "The Constitution of the United States and the laws made in pursuance thereof shall be the supreme law of the land;" and the 14th amendment thereof, providing, that "No state shall

make or enforce any law which shall abridge the privileges or immunities of citizens of the United States."

Thus, after all of the above-purported trust organizations had been created, the relationship among petitioner and his various organizations was as shown in the chart on page 903.

Because of the way the purported business trust organizations were structured, and because petitioner was the only trustee, or the only trustee with power to act, petitioner was at all times in complete control of the five organizations he had established. Any contract, loans, or other transactions among these entities were executed or performed by petitioner, either in his capacity as a trustee or executive trustee of one or more of the purported trust organizations. No individual other than petitioner had any proprietary, beneficial, or equitable interest in any of the organizations or their assets.

In purchasing the ATES package, and in establishing the above organizations pursuant to its guidance, petitioner's purposes were to reduce his Federal tax liabilities, to protect his assets from potential malpractice claims, and to eliminate probate costs in his estate with respect to assets placed in the business trusts.

Bank accounts were opened for Professional Services, Alaska Rentals, Swiss International, and National Service in September 1977. No account was opened for Professional Management.

On September 5, 1977, Professional Services entered into a "contract" with National Service wherein National Service agreed to supply dental practice management services to Professional Services (hereinafter the management contract). Professional Services agreed to pay National Service $16,000 per month for the rest of 1977 for these services. This contract was signed for Professional Services by petitioner as executive trustee of Professional Services and for National Service by petitioner as trustee of Professional Management, which was trustee of National Service. As the trusts were actually structured, petitioner, himself, was to render all management services to his dental practice, ostensibly in his capacity as trustee of Professional Management, which was trustee of National Service.

On September 10, 1977, petitioner, in his capacity as executive trustee of Professional Services, entered into a

[1] TCU's refers to Trust Certificate Units.

"contract" with himself, in his individual capacity, wherein Professional Services agreed to supply petitioner with all equipment, clinic and supplies, as well as management and other services, which were necessary in the conduct of his dental practice. Under the specific terms of the contract, petitioner in his individual capacity agreed to pay Professional Services the following:

1. Rent ................................. $2,500 per month
2. Utilities ............................. 1,000 per month
3. Personnel ........................... 5,333 per month
4. Equipment .......................... 3,000 per month
5. Accounting ......................... 2,000 per month
6. Management (special study) .... 9,000 per month
7. Collections ......................... 1,000 per month

Payments under the above contract were, by the contract terms, to commence in September 1977, except with respect to payments for personnel, which were to commence in October 1977. Thus, total payments required under the contract amounted to $89,999 in 1977.

Petitioner wrote checks against his own account payable to Professional Services in 1977 as follows:

| Date | Amount |
|---|---|
| Oct. 7, 1977 | $10,000 |
| Oct. 28, 1977 | 10,000 |
| Nov. 28, 1977 | 15,000 |
| Dec. 12, 1977 | 10,000 |
| Dec. 27, 1977 | 30,000 |
| Dec. 27, 1977 | 10,000 |
| Total | 85,000 |

Thus, although total payments due to Professional Services on the above "contract," as indicated above, amounted to $89,999, only $85,000 was actually paid to that entity in 1977.[14] Moreover, the contract required that payments were to be made on a per-month basis. Total monthly payments due under the contract were $18,500, $23,833, $23,833, and $23,833

---

[14]Although petitioners deducted $88,000 as amounts paid to Professional Services in 1977, they now concede that they were only entitled to deduct $85,000.

for the respective months of September, October, November, and December. However, as indicated above, the total dollar amount of the checks written by petitioner to Professional Services for the respective months of September, October, November, and December, were $0, $20,000, $15,000, and $50,000. Thus, neither the total dollar amount actually transferred to Professional Services nor the amounts transferred in each of the last 4 months of 1977, coincided with the amounts due according to the contract terms.

The record does not disclose the precise nature of "management" and "collection" services which were to be rendered by Professional Services under the above "contract," and for which it charged $10,000 per month. It is clear, however, that any such services were rendered by petitioner, either in his capacity as executive trustee of Professional Services, or as trustee of Professional Management, which was trustee of National Service and which had a "management contract" with Professional Services. There is no indication that petitioner received any compensation whatsoever in exchange for his performing these services.

Petitioner, in his capacity as executive trustee of Professional Services, wrote checks in 1977 against Professional Services' account which totaled as follows:

|  | Purpose | Amount |
|---|---|---|
| 1. | Taxes on business property ............. | $3,150 |
| 2. | Salaries and wages ........................ | 7,246 |
| 3. | Insurance ................................... | 347 |
| 4. | Interest on business indebtedness ..... | 806 |
| 5. | Supplies ..................................... | 3,246 |
| 6. | Lab fees ..................................... | 6,640 |

| | | |
|---|---|---:|
| 7. | Utilities ..................................... | $515 |
| 8. | Licences ..................................... | 30 |
| | Subtotal ............................ | 21,980 |
| 9. | Payable to National Service ............ | 64,000 |
| | Total ................................[15] | 85,980 |

These amounts were deducted by Professional Services on its 1977 fiduciary income tax return against its disclosed gross income of $85,000. Professional Services reported a net loss of $2,735 and paid no Federal income tax in 1977.[16]

According to the terms of the management contract between Professional Services and National Service, payments were required to be made in the amount of $16,000 per month. However, the checks which were issued to National Service, although totaling $64,000 in 1977, did not coincide with the monthly payment requirements set out in the management contract. To the contrary, no amounts were transferred to National Service in September 1977. For the months of October, November, and December, checks in the amounts of $10,000, $10,000, and $44,000, respectively, were written to National Service by Professional Services. The record does not establish what services, if any, were rendered by National Service under the management contract. It is clear, however, that any services which were rendered were performed by petitioner, since he was the only individual authorized to act on behalf of National Service, in his capacity as trustee of Professional Management, which was trustee of National Service. It is also clear that petitioner in his individual capacity received no compensation from either Professional Management or National Service in consideration of his performance of these services.

[15]The total amount paid out by Professional Services in 1977 (i.e., $85,980) exceeds the amount transferred from petitioner to Professional Services in 1977 (i.e., $85,000), because checks were written on Professional Services' account late in 1977 in excess of the balance in Professional Services' account. Additional amounts were deposited in Professional Services' account early in 1978 to meet the overdraft.

[16]Professional Services reported $85,000 as gross receipts and deducted the $85,980 noted above. Additionally, Professional Services claimed $1,655 as a depreciation deduction and claimed a $100 exemption. Thus, Professional Services reported negative taxable income of $2,735.

Of the $85,000 petitioner paid to Professional Services, $64,000 remained there only for a theoretical instant. The checks totaling $64,000 which were made payable to National Service, as listed above, were written on the same date that petitioner transferred these funds to Professional Services. The same amounts were, on the same date, transferred to Swiss International, and, on the same date, were then transferred to Alaska Rentals. Finally, on the same date that the original checks were written to Professional Services, National Service, Swiss International, and Alaska Rentals, checks totaling $59,000 were written on Alaska Rentals, payable to petitioner. Before the close of the 1977 taxable year, Alaska Rentals transferred $3,500 more of this amount to petitioner. Thus, of the total amount of $85,000 originally transferred by petitioner to Professional Services, $62,500 was passed through petitioner's business trust organizations and returned to him either on the same day of the original transfer, or before the close of the taxable year. The sequential flow of these funds is detailed in the footnote below.[17] All of the checks involved were personally prepared by petitioner, in his individual capacity or in his capacity as trustee or executive trustee of the various trust organizations, although petitioner employed a bookkeeper to prepare all of the checks which were used to pay the normal expenses of his dental practice in 1977.

Exactly what services, if any, were rendered by Swiss International as advisory trustee to National Service is not disclosed on the record. It is, however, clear that any services

---

[17]Petitioner drew checks on his professional or business bank account (hereinafter DDS account) to Professional Services, and the funds were further transferred and received by other entities, on the dates and in the amounts shown by the following table:

| | | | Received by— | | | |
|---|---|---|---|---|---|---|
| Date | Amount | Professional Services | National Service | Swiss Int'l | Alaska Rentals | Petitioner |
| Oct. 7, 1977 | $10,000 | $10,000 | $5,000 | $5,000 | $5,000 | $5,000 |
| Oct. 28, 1977 | 10,000 | 10,000 | 5,000 | 5,000 | 5,000 | [1]3,500 |
| Nov. 28, 1977 | 15,000 | 15,000 | 10,000 | 10,000 | 10,000 | 10,000 |
| Dec. 12, 1977 | 10,000 | 10,000 | 5,000 | 5,000 | 5,000 | 5,000 |
| Dec. 27, 1977 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 |
| Dec. 27, 1977 | 10,000 | 10,000 | 9,000 | 9,000 | 9,000 | 9,000 |
| Totals | 85,000 | 85,000 | 64,000 | 64,000 | 64,000 | 62,500 |

[1] Deposited Dec. 12, 1977.

rendered were performed by petitioner, ostensibly in his capacity as trustee of Professional Management, which was trustee of Swiss International. It is equally clear that petitioner received no compensation for services so rendered.[18]

In January 1978, petitioner's accountant prepared six documents which are labeled "promissory notes" and purport to evidence loans totaling $64,000 from Swiss International to Alaska Rentals. These documents were backdated to make it appear that they had been prepared on the same date that the funds were transferred in 1977 (see findings in note 17 *supra*). Thus, the six purported promissory notes were dated October 7, 1977, October 28, 1977, November 28, 1977, December 12, 1977, December 27, 1977, and December 27, 1977, respectively. Each of these documents was signed by petitioner in 1978.

The due dates of the six purported loans from Swiss International to Alaska Rentals, as reflected in this set of documents, were respectively as follows: January 6, 1978; January 27, 1978; February 26, 1978; March 10, 1978; March 25, 1978; March 25, 1978. These six documents also indicate that, simultaneously with the making of the purported loans to Alaska Rentals by Swiss International, the latter entity transferred the promissory notes evidencing those "loans" to petitioner by gift. Petitioner, according to this first set of documents, thereby became payee under these notes without assuming any liability thereon.

A second set of documents which relate to four of the above six "loan" transactions was prepared by petitioners' accountant in March or April of 1978, at or after the due dates of the original notes, and alters the first set of documents in two respects. First, the due dates for each of four of the original "loans" from Swiss International to Alaska Rentals were changed. According to this set of documents, the respective due dates on the "loans" were as follows: October 7, 1982; November 28, 1982; December 27, 1982; and December 27, 1982. Second, these documents indicate that petitioner, simultaneously with the transfer of funds from Swiss International to Alaska Rentals, and from Alaska Rentals to petitioner, undertook to assume liability on the loans from Swiss Interna-

---

[18]When questioned as to how the $10,000 fee figure was determined, petitioner could offer no explanation other than that the $10,000 was "just a figure."

tional to Alaska Rentals. This set of documents covers $54,000 of the total transfer of $62,500 to petitioner.

This second set of documents was also backdated to make it appear that the documents were prepared in 1977 when the original checks were drafted. Petitioner signed these documents in March or April, 1978.[19]

Yet a third set of documents was prepared covering the above transactions. This third set of documents was prepared by petitioner's accountant in 1981, after petitioner's attorney herein criticized the language contained in the second set. This set of documents reflects that petitioner assumed liability on four of the purported promissory notes totaling $54,000, evidencing the "loans" from Swiss International to Alaska Rentals, and contains the same due dates as the second set of documents. Additionally, this third set of documents indicates that Swiss International gave to petitioner one of the promissory notes with a face amount of $5,000. According to this set of documents, Alaska Rentals remained indebted to Swiss International on one of the notes with a face amount of $5,000. This set of documents was also backdated and signed by petitioner. This set of documents was presented to respondent's agent as copies of the original, correctly dated notes.

Petitioner did not reflect these "loans" on any of the three financial statements he prepared during the years 1978, 1979, and 1981. Two of these financial statements were submitted as "full, true, and correct statement[s] of his financial condition on the date stated." The other financial statement was submitted as "true and represent[ing] a total disclosure of all information requested." Moreover, petitioner did not list these "loans" as liabilities on a petition for a dissolution of his marriage which was filed with the Alaska Superior Court in Anchorage on December 5, 1980.

On January 2, 1980, petitioner, in his capacity as trustee of Professional Management, which was trustee of Swiss International, executed documents in Alaska which purported to create Anchorage Investments (hereinafter Anchorage), another business trust organization. The relevant trust's terms

---

[19]When questioned as to why he wanted these transfers to be cast in the form of loans rather than gifts, petitioner stated that he could not think how to explain "getting a large sum of money as a gift from a nonresident alien."

and duration were substantially similar to those of petitioners' previously created organizations. Upon creation of this purported entity, Swiss International transferred to Anchorage the four promissory notes totaling $54,000, on which petitioner contends that he assumed liability. Anchorage was also completely controlled by petitioner.

No repayments had occurred on any of these purported loans up to July 1980. Prior to that time, the statutory notice of deficiency in this case had been issued, the petition had been filed, and respondent had begun pretrial discovery herein. Beginning in July 1980, petitioner wrote checks to Anchorage which purportedly represented payment on the above "loans."

On their 1977 joint return, petitioners deducted the entire amount transferred to Professional Services as ordinary and necessary business expenses. As noted in note 14 *supra*, petitioners deducted $88,000 as amounts paid to Professional Services in 1977. They now concede that only $85,000 was actually transferred to that entity in 1977. The deductions for payments to Professional Services were not identified as such in petitioners' return, but were part or all of claimed deductions in various amounts on Schedule C (relating to petitioner's dental practice) labeled as "rent," "utilities," "commissions," "legal and professional fees," etc. Respondent disallowed these deductions in full on the grounds that the payments were neither ordinary and necessary business expenses nor actually expended for the purposes designated. Additionally, respondent determined that the income of Professional Services, as found by respondent (except that entity's claimed deduction for amounts paid to National Service as management fees, which respondent disallowed),[20] were attributable to petitioners under the grantor trust provisions of sections 671 through 677. Moreover, respondent determined that petitioners were liable for additions to tax under section 6653(a). By way of amended answers, respondent now contends that petitioner is liable for additions to tax under section 6653(b) and only alternatively contends that petitioners are liable for additions to tax under section 6653(a).

---

[20]Respondent also disallowed amounts claimed by Professional Services as paid for lab fees ($6,640), salaries and wages ($7,246), and taxes ($3,150). Respondent now concedes that these amounts are properly deductible, but contends they are deductible only by petitioners.

In their petition herein, petitioners claimed that the amounts paid to Professional Services were, in fact, deductible as ordinary and necessary business expenses. Petitioners also claimed that the grantor trust provisions are inapplicable to Professional Services, as a basis of taxing its income to them. At trial, with respondent's consent and by leave of this Court, petitioners orally amended their petition herein to conform to the evidence and to claim an additional deduction, in the amount of $11,000, for the ATES package purchased in 1977. Although petitioners have not formalized such amendment in writing, the issue is treated as properly raised by petitioners and denied by respondent. Rule 41(b).

With respect to Professional Services, respondent determined a deficiency, and an addition to tax under section 6653(a), based upon disallowing certain deductions claimed in its 1977 fiduciary tax return. After concessions, the only remaining issue regarding deductions claimed by Professional Services is the deductibility of the claimed "advisory trustee fees" of $64,000 transferred by Professional Services to National Service, and the issue of addition to tax under section 6653(a).

Petitioner, a dentist, is an educated man and, at time of trial, had operated and managed his own dental practice for 17 or 18 years. By 1977 he had engaged in at least three different real estate or rental ventures and a commercial fishing operation. He knew, prior to the time he became involved with business trust organizations, that the overall plan here involved was questionable, at least from the perspective of the Internal Revenue Service. However, he nonetheless failed to seek advice of competent legal counsel prior to entering into these transactions. Petitioner was somewhat less than cooperative when the Internal Revenue Service attempted to examine his 1976 and 1977 tax years. Petitioner repeatedly delayed meetings requested by respondent's agent. Only after this Court ordered petitioner to produce his records was such information forthcoming. Petitioner's 1977 return was filed fraudulently, with intent to evade tax.

OPINION

## I. 1976

The first issue for decision is whether petitioners are entitled to deduct $47,400 in 1976 which they purportedly paid for the purchase of materials relating to business trust organizations. If we decide that petitioners are not entitled to deduct this $47,400, we must also decide whether Eugene Morton is liable for additions to tax under section 6653(b) or, alternatively, whether Eugene and Patricia Morton are liable for additions to tax under section 6653(a).[21]

Respondent contends that no portion of the $47,400 purported payment is deductible by petitioners. This contention is grounded on two alternative theories. First, respondent argues that petitioner's "purchase" of the tax package materials was devoid of economic reality in that no amounts were, in substance, paid by petitioners. Alternatively, respondent maintains that even assuming that the $47,400 was, in substance, paid by petitioner, such payment represented merely a personal expense of petitioner and is therefore rendered nondeductible by section 262. Petitioners, on the other hand, contend that $47,400 was in substance, as well as in form, paid in 1976, and further argue that this payment represented a deductible expenditure under sections 162 and/or 212.

Section 162 provides in pertinent part:

SEC. 162(a). IN GENERAL.—There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business * * *

Section 212 provides:

In the case of an individual, there shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year—
    (1) for the production or collection of income;
    (2) for the management, conservation, or maintenance of property held for the production of income; or
    (3) in connection with the determination, collection, or refund of any tax.

Petitioners herein are on the cash method of accounting,

---

[21]For the sake of convenience, the asserted additions to tax for both tax years 1976 and 1977 will be considered together under a single subheading *infra*.

and are therefore entitled to deduct allowable items of expense under either section 162 or section 212 in the year in which the expenses are paid in cash or its equivalent. Sec. 1.461–1(a)(1), Income Tax Regs.; *Eckert v. Burnet*, 283 U.S. 140 (1931). However, in order to support a deduction under these provisions, the requisite "payment" must be one in substance, and not merely in form. As we have stated in *Golsen v. Commissioner*, 54 T.C. 742, 754 (1970), affd. 445 F.2d 985 (10th Cir. 1971), cert. denied 404 U.S. 940 (1972):

It has repeatedly been held that the substance of a transaction rather than the form in which it is cast is determinative of tax consequences unless it appears from an examination of the statute and its purpose that form was intended to govern * * *

In determining whether petitioners truly paid $47,400 in 1976 for the purchase of the tax package, petitioners would have us focus our attention solely on the fact that this amount was transferred by petitioner to ITBC in exchange for the tax package materials. However, the true substance of a particular transaction may not always be gleaned from a myopic examination of a single event. Where a formally separate transaction is merely one step in a series of integrated and interdependent steps which are focused on a particular end result, an examination of that individual event, in isolation from the several integrated steps, and a determination of Federal tax consequences based on such an isolated examination, could lead to results which do not comport with economic reality. In such a case, the incidence of Federal taxation must be determined by reference to the overall economic result of the series of interrelated transactions; and the ostensibly separate steps leading to this overall result will not be afforded independent significance. As we have stated in *Lazarus v. Commissioner*, 58 T.C. 854, 864 (1972), affd. 513 F.2d 824 (9th Cir. 1975):

"Technical considerations, niceties of the law of trusts or conveyances, or the legal paraphernalia which inventive genius may construct" must not frustrate an examination of the facts in light of the economic realities. *Helvering v. Clifford*, [309 U.S. 331] at 344. Moreover, in ascertaining such realities, a series of related transactions may not be broken into bits and pieces but must be viewed as a whole. *Minnesota Tea Co. v. Helvering*, 302 U.S. 609, 613 (1938); *Kanawha Gas & Utilities Co. v. Commissioner*, 214 F.2d 685, 691 (5th Cir. 1954).

In the present case, it is abundantly clear that petitioner's transfer of $47,400 to ITBC was only one step in a series of interdependent steps which was focused on a particular end result. Mr. Bumpus and Mr. Huff conceived the overall tax package purchase and sale plan in November 1976. According to their plan, Mr. Bumpus, Mr. Huff, and the prospective purchaser would first decide on an appropriate "price" to charge the prospective purchaser. Once this price was established, the purchaser would "borrow" the tax package purchase price from one of Mr. Bumpus' controlled entities and then purchase a tax package from one of Mr. Huff's controlled entities, or vice versa, using the proceeds of the "loan" to pay the purchase price. At the time the transactions were entered into, the parties intended that the "purchaser-borrower" would not be required to repay the "loan" to the original "lender." In fact, substantially all individual purchasers' promissory notes were given by the lending entity in the above plan to a relative of, or an entity controlled by, the individual purchaser.

Prior to entering into the purchase of the tax package in 1976, petitioner was approached by Mr. Bumpus and informed about the planned sale. Pursuant to this prearranged plan, petitioner "borrowed" the tax package purchase price from Greenwich, a Bumpus-controlled foreign "entity," and simultaneously used the "loan" proceeds to purchase the tax package materials from ITBC, a Huff-controlled "entity." Although petitioner signed an unsecured deferred interest and principal note as evidence of the above "loan," it was understood from the outset that no amounts would ever be required to be repaid to the lending entity (i.e., Greenwich) on this note. In fact, only 5 months after petitioner signed this note, and before any principal or interest was paid by petitioner, Greenwich gave the note to Swiss International, an entity entirely controlled by petitioner.

The above series of transactions was thus entirely prearranged, and there is little doubt that petitioner would not have

agreed to the purchase if any one of the integrated steps in the overall plan had been omitted.[22] It is therefore clear that the loan and petitioner's transfer of the loan proceeds to ITBC in exchange for the tax package materials, together with the gift by Greenwich of the promissory note to Swiss International, must be amalgamated and the Federal tax effect of this series of transactions determined by reference to their end result.

When viewed in this light, it is apparent that petitioner's "payment" of $47,400 to ITBC was a payment merely in form and not in substance. In terms of economic reality, petitioner's "purchase" cost him nothing.

Petitioners would argue that, even viewed from this perspective, the "payment" of $47,400 represented real economic cost. In support of this contention, petitioners point out that petitioner signed a promissory note when he "borrowed" the purchase price from Greenwich and that, although this note was thereafter given to Swiss International, it nonetheless represents bona fide indebtedness.

Petitioners' view of things is, of course, tenable only if a genuine debt in fact existed. "Whether a transfer of money creates a bona fide debt depends upon the existence of an intent by both parties, substantially contemporaneous to the time of such transfer, to establish an enforceable obligation of repayment." *Delta Plastics Corp. v. Commissioner*, 54 T.C. 1287, 1291 (1970). The burden of proof of establishing the requisite intent is on petitioners (Rule 142(a); *Welch v. Helvering*, 290 U.S. 111 (1933)), and "formal evidences of indebtedness are at best clues to proof of the ultimate fact." *C. M. Gooch Lumber Sales Co. v. Commissioner*, 49 T.C. 649, 656 (1968).

We hold that petitioners have failed to meet their burden of proof on this point. In fact, the substantial weight of the evidence leads directly to the conclusion that no true liability ever existed. The terms and circumstances of the "loan," itself, clearly demonstrate that the "loan" was not bona fide. Mr. Bumpus testified to the effect that, from the outset, it was intended that petitioner would not be required to pay any

---

[22]This conclusion is reinforced when we consider that the price of the package for which petitioner was allegedly obligating himself was grossly disproportionate to the price others were paying for the same materials at about the same time. See our findings of fact *supra*.

amounts to the lending entity on the note. Rather, it was intended that the "promissory note" would be placed within the "borrower's" control prior to any payments falling due on the "note." In fact, this "note" was given to Swiss International, an entity entirely controlled by petitioner, only 5 months after the date of the original "loan" and before any amounts of principal or interest fell due on the "loan." No business purpose whatsoever has been shown for this gift, nor for Mr. Bumpus' apparent largesse, and it is quite clear from all of the facts and circumstances in this case that the parties never intended to impose any real liability on petitioners to repay this "loan." The transfer of the "promissory note" was simply the manner which the parties chose to effectuate their preconceived plan to return the "note" to petitioner's control before any payments fell due.

This lack of intent "to establish an enforceable obligation of repayment" at the time of the original transfer is, itself, enough to lead us to conclude that no bona fide debt was created. *Delta Plastics Corp. v. Commissioner, supra.* However, other factors lend further support to our ultimate finding in this regard. The promissory note, itself, was unsecured and no payment of principal or interest was to fall due for 25 years. It is highly unlikely that terms such as these would be offered in arm's-length lending. Moreover, while petitioner contends that he truly owes and intends to repay the note to Swiss International, he did not treat it as a true liability. He did not list this amount on any of the three financial statements he prepared in 1978 or 1981 in attempting to secure personal loans from banks. Two of these financial statements were submitted by petitioner as "full, true and correct statement[s] of his financial condition on the date stated." The third financial statement was submitted as "true and represent[ing] a total disclosure of all information requested." Moreover, petitioner did not list this amount as a liability in the divorce petition that he filed with the Alaska Superior Court on December 5, 1980.

Against the above factual backdrop, we have no difficulty in concluding that no genuine debt was ever created. Petitioner's "liability" was at all times, and continues to be, a mere paper liability without substance. Cf. *Karme v. Commissioner*, 73 T.C. 1163 (1978), affd. 673 F.2d 1062 (9th Cir. 1982).

Since we find that petitioner's "liability" on the $47,400 "promissory note" was without substance, it necessarily follows that, at the end of the integrated series of steps which constituted the tax package "purchase," petitioner's economic position remained exactly the same as it had been at the outset. There was, in fact, no "payment" of $47,400 by petitioner, and the deduction under either section 162 or section 212 will therefore be disallowed.[23]

## II. 1977

### A. Deduction for Cost of ATES Package

We must next decide whether petitioners are entitled to deduct the $11,000 they paid for the purchase of the ATES package. Petitioners contend that these amounts are deductible under section 212(2) as costs incurred to manage, maintain, and conserve income-producing property, or under section 212(3) as costs incurred for tax advice. Respondent contends that the $11,000 payment represented a personal expenditure and is therefore rendered nondeductible by section 262. Additionally, respondent contends that, even assuming that a portion of the expense was incurred to secure tax advice under section 212(3), petitioners have failed to show what portion of the cost was incurred specifically for that purpose and, therefore, argues that the entire deduction must be disallowed. Moreover, respondent maintains that the deduction should be denied in any event because the expenditures cannot be considered "ordinary and necessary" as required by section 212.

We will initially consider petitioners' argument under section 212(2). Section 212(2) allows a deduction for all ordinary and necessary expenses paid for the management, conservation, or maintenance of property held for the production of income. Petitioners have the burden of proving that the amounts in dispute were both "ordinary and necessary" and were expended for the purposes designated in the statute. Rule

---

[23]Our resolution of this issue makes it unnecessary for us to consider respondent's alternative contention that petitioners would not be entitled to a deduction for this amount in any event since even if petitioners, in fact, paid such amount, the expense represented a personal expense and is therefore rendered nondeductible by sec. 262.

142(a); *Welch v. Helvering, supra.* Since we think petitioners have failed to establish that the $11,000 expenditure in any way related to the management, conservation, or maintenance of income producing property, we need not consider whether the expenditure was "ordinary and necessary" within the meaning of section 212(2).

Initially, it is clear that the $11,000 payment did not relate to the management or conservation of income producing property. The materials and assistance petitioners received in exchange for the $11,000 purchase price related solely to restructuring the form in which their property was to be held. Petitioners' actual transfers of property to the "business trust organizations" did not, in substance, alter the management or economic ownership of the property. It is well established that expenses paid for advice and assistance which concerns merely rearranging title to property relates neither to the management nor conservation of such property under section 212(2). *Schultz v. Commissioner,* 50 T.C. 688, 699–700 (1968), affd. per curiam 420 F.2d 490 (3d Cir. 1970); *Epp v. Commissioner,* 78 T.C. 801 (1982); *Luman v. Commissioner* 79 T.C. 846 (1982).

Nor is petitioner's testimony that he was motivated to purchase the tax package materials and create the "business trust organizations" by his desire to minimize probate expenses and isolate his assets from potential malpractice liability sufficient to sustain petitioners' burden of proving that the expenditure related to the maintenance or conservation of income producing property.[24] Petitioners have completely failed to show what, if any, probate expenses could be saved by the creation of these "entities," and have also failed to show that the creation of these "entities" would, in fact, serve to insulate the assets transferred thereto from potential malpractice liability. Moreover, the deduction provided by section 212(2) applies to expenditures for protection or maintenance of the property, itself, not to expenditures relating to a taxpayer's retention of ownership of the property. *Epp v. Commissioner, supra; United States v. Gilmore,* 372 U.S. 39, 44

---

[24]Petitioner's testimony, upon which our findings in this regard are partially based, was actually given in connection with the acquisition of the 1976 materials. Although he did not testify concerning his motivations in connection with the 1977 purchase of the same materials, we assume that his motivations were the same, nothing appearing to the contrary.

(1963); *Reed v. Commissioner*, 55 T.C. 32, 42 (1970). Thus, even assuming petitioners are correct when they argue that the transfers of property to the "business trust organizations" would serve to insulate such property from any liability arising from petitioner's practice of dentistry, expenses incurred to transfer title to property to protect it against potential malpractice claims are not deductible under section 212(2). *Epp v. Commissioner, supra.* See also *Wallace v. Commissioner*, 56 T.C. 624, 632 (1971); *Cobb v. Commissioner*, 10 T.C. 380 (1948), affd. 173 F.2d 711 (6th Cir. 1949), cert. denied 338 U.S. 832 (1949). The deduction must therefore be disallowed under section 212(2).

Section 212(3) allows a deduction for ordinary and necessary expenses paid or incurred in connection with the determination, collection, or refund of any tax. Once again, petitioners have the burden of proving that the disputed payment was both "ordinary and necessary" and expended for the purposes designated in the statute. Rule 142(a); *Welch v. Helvering, supra.*

Petitioners contend that the cost of the ATES package is deductible under section 212(3) since it was paid, at least in part, for Federal tax planning. It is true that ordinary and necessary expenses paid for Federal tax planning are deductible under section 212(3). See *Merians v. Commissioner*, 60 T.C. 187 (1973); *Collins v. Commissioner*, 54 T.C. 1656 (1970); *Schultz v. Commissioner, supra.* However, the ATES package was marketed as a device by which a purchaser thereof could isolate his assets from liability, avoid probate costs (exclusive of estate taxes), as well as reduce his Federal tax liability. Moreover, petitioner has testified that he was motivated, in part, to purchase the package by his desire to isolate his assets from malpractice liability and reduce probate costs. To the extent that the amount in dispute was paid for these purposes, they clearly fall outside of the scope of section 212(3).

Where a petitioner sustains his burden of proof only with respect to a portion of a particular expenditure, and the record contains sufficient evidence so that a reasonable allocation between the deductible and nondeductible portions of a particular expense can be made, we will make an allocation, and allow the deduction in part. *Cohan v. Commissioner*, 39 F.2d 540 (2d Cir. 1930). Where, however, the record provides no

reasonable basis upon which we can make such an allocation, the deduction must be disallowed in full. *Epp v. Commissioner, supra; Luman v. Commissioner, supra; Zmuda v. Commissioner,* 79 T.C. 714 (1982).

Petitioners have failed to provide any rational method by which the $11,000 payment could be allocated between what they contend to be the deductible portion of the expenditure and the nondeductible portion. Thus, even assuming that a portion of the expense in issue falls within the provisions of section 212(3), no portion of the expense can be allowed. *Epp v. Commissioner, supra; Luman v. Commissioner, supra; Zmuda v. Commissioner, supra.*

Respondent's disallowance of the deduction relating to the $11,000 ATES package purchase price will therefore be sustained.

### B. Payments to Professional Services, Adjustments to Professional Services' Income, Reallocation of Professional Services' Income to Petitioners

A synopsis of the facts and the parties' respective legal arguments with respect thereto will aid in placing the disputed issues in their proper perspective.

Early in 1977, petitioners traveled to Belize in Central America and executed documents which purportedly created three "business trust organizations," namely: Professional Management, National Service, and Swiss International. These organizations were allegedly funded with a total of $300 and, by their specific terms, were subject to total, unrestricted dominion and control exercisable by petitioner. No other individual had authority to act on behalf of these organizations, nor had any beneficial interest therein. They remained dormant until September 1977.

On September 2, 1977, petitioner executed documents in Alaska which purportedly created two more "business trust organizations." These organizations were likewise, by their specific terms, subject to the total and unrestricted control of petitioner and no other individual was vested with authority to act on behalf of these organizations. With respect to all five of these organizations, petitioner, by the specific terms of the establishing documents, was empowered to deal with the trust property without restraint. In fact, all of the transactions

which occurred among these organizations in 1977 were conceived of, executed by, and performed solely by petitioner either in his individual capacity or ostensibly in his capacity as trustee or executive trustee of one or more of the organizations. The establishing documents make it clear that no attempt was made to separate legal and equitable title in the property transferred to these organizations.

On September 2, 1977, the same date the documents were executed which purportedly established Professional Services, petitioner executed documents, including a quitclaim deed, which purported to transfer to himself as executive trustee of Professional Services, all of the real property and equipment which he was then using in his practice of dentistry. This quitclaim deed was not recorded until late in 1979. Shortly thereafter, petitioner, in his capacity as trustee of Professional Management, which was trustee of National Service, entered into a contract with himself, as trustee of Professional Services, whereby National Service promised to provide management services to Professional Services for a fee of $16,000 per month during the remaining months of 1977. Then, on September 10, 1977, petitioner, as executive trustee of Professional Services, executed a lease agreement under which he leased back to himself, individually, for his use in the practice of dentistry, the building and equipment that he had previously conveyed to Professional Services. Additionally, Professional Services agreed to provide petitioner with "management services." These services were to be rendered by petitioner, either in his capacity as executive trustee of Professional Services, or in his capacity as trustee of Professional Management, which was trustee of National Service, which had a contract to provide management services to Professional Services. After petitioner's purported transfer of his property to Professional Services, he continued to use that property in the same manner as he had prior to the transfer.

Although payments required under the contract between Professional Services and petitioner totaled $89,999 in 1977, petitioner transferred only $85,000 to Professional Services in that year, and the monthly transfers did not comply with those required under the contract terms. Of the $85,000 transferred to Professional Services, $64,000 remained in Professional Services only for a theoretical instant. Checks totaling $64,000

were written against Professional Services' account payable to National Service on the same day as the original transfers of checks totaling $85,000 to Professional Services. This same $64,000 was then transferred by petitioner from National Service to Swiss International, and from Swiss International to Alaska Rental on the same day that the funds were originally transferred to Professional Services. Of this $64,000 circulated through these entities, $59,000 was transferred from Alaska Rentals to petitioner on the same day as the original transfer of the funds to Professional Services. An additional $3,500 of the amount circulated to Alaska Rentals was transferred to petitioner several weeks after the original transfer, but before the close of the 1977 tax year.

Petitioners claimed $88,000 of the amounts due under their contract with Professional Services as deductible business expenditures in various ways on their 1977 joint income tax return, but now concede that only the $85,000 actually paid is allowable. Respondent, in his statutory notice of deficiency, disallowed these claimed deductions in their entirety. In addition, respondent added to petitioners' income the adjusted taxable income of Professional Services, as determined by respondent.

Respondent accepted the gross income of $85,000 reported by Professional Services (the amount paid to it by petitioners), but disallowed certain deductions claimed in its return, including the $64,000 fee paid to National Service.

After concessions, the only remaining adjustment to Professional Services' income which is in issue is the claimed deduction of $64,000, and it is this same amount (plus the allowable trust exemption of $100) which respondent also added to petitioners' income, as noted in the preceding paragraph.[25]

In support of the above determinations, respondent proffers two alternative legal arguments. First, and primarily, respondent contends that Professional Services is a sham and is not entitled to be recognized for Federal tax purposes. Respondent argues that Professional Services, in conjunction with petition-

[25]Respondent's obviously inconsistent and overlapping determinations must be eliminated by our resolution of the issues herein, and can be given effect in the resulting Rule 155 computations.

er's other controlled "business trust organizations" was created solely for the purpose of enabling petitioner to manufacture deductions in excess of those normally generated by the operation of his dental practice, based on "payments" which were totally devoid of economic substance. It is therefore respondent's primary position that petitioner's Federal income tax liability should be determined as though Professional Services had never been created.

Alternatively, respondent contends that, if we should find that Professional Services is entitled to be recognized for Federal tax purposes, and further if we determine that petitioner's payments to that "entity" were payments in substance as well as in form, then the income of Professional Services should be attributed to petitioners under the grantor trust provisions of sections 671 through 677.

In either event, respondent maintains that the income of Professional Services and petitioners should be computed without allowing a deduction for $64,000 paid by petitioners to Professional Services, and, by that entity, to National Service.

Petitioners, on the other hand, maintain that by petitioner's formation of the business trust organizations, he "restructured his entire manner of doing business," that the entities thus created were not shams, and that all payments made to Professional Services were payments in substance as well as in form. Accordingly, petitioners contend that they are entitled to deduct the full amount of $85,000 paid in 1977.

Additionally, petitioners contend that the income of Professional Services should not be attributed to them under the grantor trust provisions. In support of this contention, petitioners argue, for the first time on brief, that Professional Services is not taxable as a trust and is therefore not subject to the grantor trust rules. Petitioners maintain that Professional Services constitutes a Massachusetts business trust, and, as such, should be classified as an association taxable as a corporation rather than as a trust for Federal tax purposes. Furthermore, petitioners argue that Professional Services' "payments" of $64,000 to National Service constitute an ordinary and necessary business expense, and are therefore properly deductible by that "entity" under section 162.

Before moving to the parties' substantive arguments, a preliminary procedural point must be addressed. As noted

above, in their original brief, petitioners for the first time contended that Professional ˙ Services is a State law/Massachusetts business trust, and should therefore be classified as an association taxable as a corporation for Federal tax purposes. Although this contention was raised in response to respondent's alternative assertion that the grantor trust rules apply with respect to Professional Services, a resolution of this issue in favor of petitioners would completely alter the posture of this case as it was pleaded and tried. Petitioners had consistently taken the position that Professional Services is taxable as a trust until their argument on brief. That entity filed fiduciary returns, and no indication that petitioners had changed their position in this regard was presented in their pleadings or amended pleadings.

We have consistently held that since the primary purpose of pleadings is the joinder of issue between the parties, issues attempted to be raised by brief will be disregarded. *Factor v. Commissioner*, 281 F.2d 100, 122 (9th Cir. 1960), affg. a Memorandum Opinion of this Court, cert. denied 364 U.S. 933 (1961); *Gregg v. Commissioner*, 18 T.C. 291 (1952), affd. per curiam 203 F.2d 954 (3d Cir. 1953); *H.D. & J.K. Crosswell, Inc. v. Commissioner*, 6 B.T.A. 1315 (1927). See also Rules 31(a), 34(a). Thus, as a procedural matter, we would be free to decline to consider this issue. In any event, however, we do not think it is necessary for us to determine whether Professional Services falls within a particular classification under State law. Since, as explained below, we believe that Professional Services was without real substance and is therefore not entitled to be recognized for Federal tax purposes, it is unnecessary for us to consider whether Professional Services falls within a particular State law niche. See, e.g., *Furman v. Commissioner*, 45 T.C. 360, 364 (1966), affd. per curiam 381 F.2d 22 (5th Cir. 1967); *Markosian v. Commissioner*, 73 T.C. 1235 (1980). It is equally unnecessary for us to determine how Professional Services would have been taxed if it, in fact, had any real substance.

The "sham" theory requires that we examine not only the surface transactions and entities involved, but also requires that we examine their reality. *Weyl-Zuckerman & Co. v. Commissioner*, 23 T.C. 841, 847 (1955), affd. per curiam 232 F.2d 214 (9th Cir. 1956). We must, that is, look beyond "superficial formalities of a transaction to determine the

proper tax treatment." *Blueberry Land Co. v. Commissioner*, 361 F.2d 93, 101 (5th Cir. 1966), affg. 42 T.C. 1137 (1964). Labels, semantic technicalities, and formal written documents do not necessarily control the tax consequences of a given transaction. Rather, we are concerned with economic realities and not the form employed by the parties. *Frank Lyon Co. v. United States*, 435 U.S. 561, 572 (1978). Transactions which are devoid of economic substance and are engaged in solely to acquire tax benefits will be disregarded. *Knetsch v. United States*, 364 U.S. 361 (1960); *Grodt & McKay Realty, Inc. v. Commissioner*, 77 T.C. 1221(1981); *Derr v. Commissioner*, 77 T.C. 708 (1981). Additionally, the fact that all of the entities involved herein are controlled, either directly or indirectly, by petitioner requires that we closely scrutinize transactions occurring among these entities and petitioner in determining their substance. *Investors Diversified Services, Inc. v. Commissioner*, 39 T.C. 294, 306 (1962), affd. 325 F.2d 341 (8th Cir. 1963); *Bixby v. Commissioner*, 58 T.C. 757, 776 (1972). Moreover, whether the transactions and entities lack economic substance is a factual question which must be decided within the unique parameters of this case. *United States v. Cumberland Public Service Co.*, 338 U.S. 451 (1950).

When viewed in the above light, it becomes clear that no substantial change in economic ownership of the assets or income of petitioner's dental practice was effected by his purported transfer of those assets, and subsequent "payments," to Professional Services (and onward to other entities), and it therefore necessarily follows that Professional Services is not entitled to be recognized as a separate entity for Federal tax purposes. As we have stated in *Markosian v. Commissioner, supra* at 1241: "When the form of a transaction has not, in fact, altered any cognizable economic relationships, we will look through the form and apply the tax law according to the substance of that transaction." Cf. *Bixby v. Commissioner, supra*; *Miles v. Commissioner*, 41 T.C. 165 (1963); *Burde v. Commissioner*, 352 F.2d 995 (2d Cir. 1965), affg. 43 T.C. 252 (1964), cert. denied 383 U.S. 966 (1966).

Initially, the documents which purport to establish Professional Services as an entity separate and distinct from petitioners, themselves, fail to alter "any cognizable economic relationship" between petitioner and the property purportedly

transferred. That is, the specific terms and conditions (or, rather, lack of conditions) contained in these documents left petitioner in exactly the same relationship to the property after the "transfer" that he was in prior to the "transfer."

These documents named petitioner "executive trustee" of Professional Services. As executive trustee, petitioner was entrusted with:

sole authority acting in behalf of all other Trustees. This authority includes the power to execute contracts of any description, buy and sell property of all kinds, direct the management concerning any affair that will benefit the trust or *any other powers provided for in the trust indenture.* [Emphasis supplied.]

Moreover, the documents vested the trustee with absolute and unrestricted authority to act in any manner with respect to trust property. The documents provided that: "Resolutions of the Board of Trustees authorizing that a special thing to be done shall be evidence that such act is within its powers."

Additionally, petitioners owned all of the trust certificate units of Professional Services during the years in issue and were therefore entitled to all of the trust assets upon its termination, and such termination could occur at any time in the sole discretion of petitioner as executive trustee.[26]

We therefore cannot perceive any economic interest which passed to anyone other than petitioners under the specific terms of the trust instrument. Petitioner continued to possess unlimited power to deal with the trust property (and its income) in any manner he chose. Cf. *Markosian v. Commissioner, supra.*

In addition to the failure of the documents which established Professional Services to vest that entity with substantial incidents of economic reality, other factors in the totality of facts convince us that Professional Services must be treated as a nullity for Federal tax purposes. First, although petitioner

---

[26]As indicated in the findings of fact, the documents which established Professional Services provided:

"This Trust Organization shall continue for a period of twenty-five years from date, unless the Trustees shall unanimously determine upon an earlier date. The Trustees may at their discretion, because of threatened depreciation in values, or other good and sufficient reason, liquidate the assets, distribute and close the Trust Organization at any earlier date determined by them. The Trust shall be proportionately and in a pro rata manner distributed to the Certificate Holders."

executed a quitclaim deed in favor of Professional Services as evidence of the transfer of his dental office and building in September 1977, that deed was not recorded until late in 1979. The trust instruments were never recorded. See *Furman v. Commissioner, supra.*

Second, petitioner contends that he reacquired the right to use the property transferred to Professional Services only by virtue of the lease agreement which he signed in both his individual capacity and in his capacity as executive trustee of Professional Services. However, the property was purportedly transferred to Professional Services on September 2, 1977, and the leaseback "agreement" was not executed until September 10, 1977. Moreover, no funds were "transferred" to Professional Services until October 7, 1977, although, under the terms of the lease agreement, $18,500 was due in September. Additionally, although total payments due under the lease agreement in 1977 were $89,999, only $85,000 was actually transferred to Professional Services in 1977. Thus, petitioner continued to use the property purportedly transferred to Professional Services in his dental practice in exactly the same manner as he had prior to the "transfer" until September 10, 1977, although no formal lease had been executed. Moreover, petitioner's use of this property continued unrestricted after the execution of a formal lease, although the terms of the lease were not strictly complied with, and petitioner, as executive trustee, made no effort to enforce the lease according to its terms. Cf. *Audano v. United States*, 428 F.2d 251 (5th Cir. 1970).

Finally, although the avowed purpose of the trust was to—

provide for a sane and economical administration by natural persons acting in a fiduciary capacity, to begin at once and that the Trustees act solely within their constitutional rights as based upon their common law rights and immunities vouchsafed to citizens of the United States of America and defined in Article IV, Section 2, providing that "Citizens of each state shall be entitled to all privileges and immunities of citizens in several states:" and Article VI, Section 2, providing that "The Constitution of the United States and the laws made in pursuance thereof shall be the supreme law of the land;" and the 14th Amendment thereof, providing, that "No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States."

it is clear that, in reality, Professional Services, as well as petitioner's other "business trust organizations," acted solely

as conduits in non-arm's-length, prearranged transactions which were designed to generate tax deductions in excess of those legitimately generated in petitioner's practice of dentistry, at zero economic cost to petitioner. Cf. *Plunkett & Co. v. Commissioner*, 42 B.T.A. 464 (1940).

In this regard we note that, of the $85,000 transferred to Professional Services in 1977, only $21,000 remained within that entity for more than a theoretical instant. This amount was used to pay certain ordinary and necessary expenses of petitioner's dental practice, and the funds, themselves, were generated by petitioner's dental practice.[27] The remaining $64,000 was circulated through petitioner's other controlled "business trust organizations," the majority of these funds (i.e., $59,000) were redeposited in petitioner's personal account *on the same day* as the original transfer of the funds to Professional Services, and $3,500 of this amount was redeposited in petitioner's personal account shortly thereafter.

Although the circulation of these funds was variously camouflaged as payments for "management fees" and "advisory trustees fees," petitioner has failed to establish what, if any, services were rendered in consideration of these "payments." Moreover, although petitioner attempted to retroactively camouflage, as gifts and loans, the retransfers of funds to himself at the end of the circular flow, it is apparent that these transfers were merely the final step of petitioner's overall plan to generate deductions at no out-of-pocket cost, and that petitioner did not assume any real liability at any point with respect to any alleged loans. The salient fact is that, irrespective of the form in which petitioner attempted to cast the various transfers of funds, at all times, by the specific terms of the documents which created the entities through which the funds were passed, petitioner maintained absolute and unrestricted control over the funds, as well as the "promissory notes" which petitioner purportedly signed, and no one other than petitioners ever had any legal or beneficial interest therein.[28] Cf. *Plunkett v. Commissioner, supra.*

---

[27]Respondent has now conceded the deductibility of these items by petitioners.

[28]The above analysis applies with equal force to petitioner's purported "repayment" of the liabilities to Anchorage Investments in 1980. Petitioner maintained absolute control over

In summary, we find that petitioners' creation of Professional Services failed to alter any cognizable economic relationships, and we therefore hold that Professional Services is totally devoid of economic reality and is to be treated as a nullity for Federal tax purposes. *Markosian v. Commissioner, supra; Furman v. Commissioner, supra; Zmuda v. Commissioner, supra.* Professional Services was formed and operated as a mere paper entity, and served solely as a conduit through which petitioner manufactured deductions based upon payments which were without substance. Petitioners' taxable income for their 1977 tax year will therefore be determined as though Professional Services was never created. Only those deductions claimed by petitioners or by Professional Services which have been conceded or allowed by respondent will therefore be allowed. Having so held, it follows that respondent's determination of additional income against Professional Services, and the further attribution of that same income to petitioners, is disapproved.

Our holding makes it unnecessary for us to consider the application of sections 671 through 677 to the facts herein.

### III. Additions to Tax—1976 and 1977

The final issues presented for decision involve respondent's determinations of additions to tax. Respondent contends that petitioners' underpayment of tax was due to fraud in both years in issue. Accordingly, respondent maintains that petitioner Eugene Morton (alone) is liable for additions to tax under section 6653(b). Alternatively, if petitioner is not liable for additions to tax under section 6653(b), respondent contends that both petitioners are liable for additions to tax under section 6653(a). Respondent also determined additions under section 6653(a) against Professional Services.

Section 6653(b) imposes a 50-percent addition to tax on an underpayment of tax for a year in which any part of the underpayment is due to fraud. The burden of proving fraud is on respondent, and he must do so by clear and convincing

---

these funds both before and after the "repayments," and it is clear that these transfers were merely an attempt by petitioner to add superficial legitimacy to transactions which were, in fact, without substance.

evidence. Rule 142(b); sec. 7454(a); *Stone v. Commissioner*, 56 T.C. 213, 220 (1971); *Miller v. Commissioner*, 51 T.C. 915, 918 (1969). When fraud is asserted for more than 1 taxable year, respondent must show that some part of the underpayment was due to fraud for each taxable year in issue for the corresponding addition for fraud for each such year to be upheld. *Otsuki v. Commissioner*, 53 T.C. 96, 105 (1969). Fraud is defined as an intentional wrongdoing designed to evade tax believed to be owing. *Mitchell v. Commissioner*, 118 F.2d 308, 310 (5th Cir. 1941); *Powell v. Granquist*, 252 F.2d 56, 60 (9th Cir. 1958); *Estate of Pittard v. Commissioner*, 69 T.C. 391, 400 (1977).

Whether fraud exists with respect to a particular tax year is a factual question which must be resolved by an examination of the entire record. *Mensik v. Commissioner*, 328 F.2d 147, 150 (7th Cir. 1964), affg. 37 T.C. 703 (1962), cert. denied 379 U.S. 827 (1964); *Otsuki v. Commissioner, supra*. Since fraud can seldom be established by direct proof, the requisite intent may be inferred from a showing by respondent that petitioner's conduct was intended to conceal, mislead, or otherwise prevent the collection of taxes that petitioner knew or believed he owed. *Stoltzfus v. United States*, 398 F.2d 1002, 1004 (3d Cir. 1968), cert. denied 393 U.S. 1020 (1969); *Acker v. Commissioner*, 26 T.C. 107 (1956). Moreover, fraud may be established, in a proper case, by showing an overstatement of deductions as well as by an omission of income. *Neaderland v. Commissioner*, 52 T.C. 532, 540 (1969), affd. 424 F.2d 639 (2d Cir. 1970), cert. denied 400 U.S. 827 (1970). However, since respondent's assertion of fraud requires an inquiry into the taxpayer's frame of mind, seldom can a single act or omission prove determinative of the requisite fraudulent intent. Rather, such intent, or lack thereof, must generally be determined by surveying a taxpayer's whole course of conduct. *Stratton v. Commissioner*, 54 T.C. 255, 284 (1970).

As we consider the facts bearing on respondent's assertion of fraud, we keep in mind that a taxpayer's attempt to avoid paying taxes does not necessarily establish fraud. As petitioners point out, it is well settled that a taxpayer is entitled to arrange his affairs so as to minimize his tax liability. *Gregory v. Helvering*, 293 U.S. 465 (1935). No wrongful intent is inherent in a taxpayer's attempts in this regard. Thus, if

petitioner was of the honest although mistaken opinion that the transactions involved were legally sufficient to support the claimed deductions, no fraudulent intent was present. As we have stated in *Mayock v. Commissioner*, 32 T.C. 966, 974 (1959):

Although petitioner may have been mistaken as to the legal consequences of the transaction, we are satisfied he had no intention of evading a tax believed to be owing. A mistake of law, if it was a mistake, is not equivalent to the fraud with intent to evade tax * * *

Upon careful review of the record in this case, we conclude that the underpayments of tax for the years in issue resulted from something more than petitioner's honest mistake as to the legal consequences of the various transactions involved. In fact, petitioner's whole course of conduct clearly and convincingly shows that the underpayments of tax were due to fraud. It is clear that petitioner claimed deductions on his 1976 and 1977 returns which he knew were based on "payments" which were without substance and thereby attempted to evade taxes he knew to be owing.

In 1976, petitioner, pursuant to a prearranged plan, "borrowed" $47,400 from an entity controlled by one of the promoters of the scheme here involved, immediately turned this money over to another entity controlled by the other promoter, and signed a "promissory note" to the entity from which he "borrowed" the money. This "promissory note" was not intended to impose any real liability on petitioner, but rather was executed in an attempt to conceal the real substance (or, rather, lack of substance) of the transaction. At the time the note was signed, it was intended that petitioner would never have to repay any amounts on the note. In fact, the note was returned to petitioner's unrestricted control prior to the time he filed his 1976 return. He therefore knew, when he filed that return, that he had not incurred the cost for which he was claiming a deduction. In the circumstances, his conduct constituted fraud within the meaning of section 6653(b). Compare *Schallman v. Commissioner*, 102 F.2d 1013 (6th Cir. 1939), affg. a Memorandum Opinion of this Court; *Clarke v. Commissioner*, 22 B.T.A. 314 (1931).

That petitioner knew that no real debt was created by the above series of transactions is clearly demonstrated by his subsequent actions. He failed to acknowledge this "debt" on financial statements he prepared in attempting to secure

personal loans from banks. Additionally, he did not include this amount in a divorce petition filed with the Superior Court of Alaska. Petitioner's execution of the "promissory note" was merely his attempt to add superficial legitimacy to a transaction which he knew was totally devoid of economic result.

In 1977, petitioner again claimed deductions, to the extent of $64,000, based on "payments" which represented no real economic cost to him. All of the checks in the circular flow of funds were personally prepared by petitioner. All of the "entities" through which the funds were passed were subject to the unrestricted control of petitioner. Petitioner was never deprived of control over the money which formed the basis of the claimed deduction. In fact, the majority of these funds were withdrawn from his DDS account and redeposited in his personal account on the same day. Obviously, petitioner knew he incurred no real economic cost by virtue of these transfers.

The manner in which petitioner has attempted to characterize the retransfers of funds to himself as loans, rather than adding any legitimacy to the purported payments, is further evidence of his fraudulent intent. Three sets of "promissory notes" were prepared to cover this same retransfer of funds. All of the notes were prepared after the close of the taxable year the retransfer occurred. All of the notes are backdated to make it appear that they had been prepared simultaneously with the retransfer of funds. All of the notes were signed by petitioner. The second and third sets of notes were prepared after the due dates had expired on at least some of the notes in the first set. Additionally, the second and third sets of notes indicate that petitioner was assuming liability on the notes, while the first set indicates that the funds were given to petitioner. This third set of notes was represented to respondent as the original and correctly dated notes representing the transactions as they occurred in 1977. Petitioner's retrospective and belated attempt to add legitimacy to the transactions which he knew were without economic result, as well as his attempt to mislead respondent by presenting these notes as original and correctly dated evidences of the transactions as they occurred in 1977, is an indication that petitioner knew what he was doing was wrong when he claimed the deduction on his 1977 return.

Additionally, petitioner was somewhat less than cooperative

when the Internal Revenue Service attempted to examine his 1976 and 1977 tax years. Petitioner repeatedly delayed meetings requested by respondent's agent. Only after this Court ordered petitioner to produce his records was such information forthcoming. This failure to cooperate with respondent's agents is an additional indication of guilty knowledge on petitioner's part. *Millikin v. Commissioner*, 298 F.2d 830, 836 (4th Cir. 1962), affg. a Memorandum Opinion of this Court; *Baumgardner v. Commissioner*, 251 F.2d 311, 323 (9th Cir. 1957), affg. a Memorandum Opinion of this Court.

Under these facts, we are convinced that petitioner, a well-educated individual with substantial business dealings, knew that the transactions involved herein in 1977, involving the payment of $64,000 to Professional Services, were insufficient to support the claimed deduction. Cf. *Iley v. Commissioner*, 19 T.C. 631 (1952); *Schallman v. Commissioner, supra; Weyl v. Commissioner*, 38 B.T.A. 850 (1938).

Accordingly, we hold respondent has met his burden of proving that some part of petitioner's underpayment of tax for both 1976 and 1977 was due to fraud, and the section 6653(b) additions to tax will therefore be sustained. This result automatically eliminates the additions to tax for both years against petitioners under section 6653(a), under the specific provisions of section 6653(b).

Having concluded that respondent's entire determination of income and resulting deficiency against Professional Services is to be eliminated, it follows that the imposition of additions to tax against it under section 6653(a) is also to be eliminated.

To give effect to the above, as well as other issues which the parties have conceded,

*Decisions will be entered under Rule 155.*