GEORGE GORDON LIDDY AND FRANCES PURCELL LIDDY, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Liddy v. Commissioner
Docket No. 7608-77.
United States Tax Court
T.C. Memo 1985-107; 1985 Tax Ct. Memo LEXIS 525; 49 T.C.M. (CCH) 932; T.C.M. (RIA) 85107; March 11, 1985. *525 For the calendar year 1972 respondent charged petitioner George Gordon Liddy with the receipt of $374,300 from various persons and the Finance Committee to Re-Elect the President. Respondent also determined that of that amount, $197,500 was disbursed by Liddy in furtherance of certain domestic intelligence operations which terminated with the so-called "Watergate" break-in, and that the balance of $176,800 was taxable income to him. Respondent further determined that all or part of the resultant underpayment of tax for the year 1972 was due to fraud. Held, petitioner's testimony established that he received funds totaling $386,000 and that he disbursed $340,370 of that amount in furtherance of his intelligence operations. Petitioner failed to carry his burden with respect to the disbursement of the remaining $45,630, and consequently he is deemed to have income in that amount. Held further, Mrs. Liddy qualifies as an innocent spouse within the meaning of sec. 6013, I.R. C. 1954, and consequently is relieved of any liability attributable to the foregoing inclusion in income. Held further, respondent failed to carry his burden of proof that the omission of said income was due *526 to fraudulent intent. Roger V. Barth and Paul S. Richter, for the petitioners. Robert T. Hollohan, for the respondent. STERRETT
MEMORANDUM FINDINGS OF FACT AND OPINION STERRETT, Judge: By notice of deficiency dated April 15, 1977, respondent determined a deficiency in petitioners' Federal income tax for the year ended December 31, 1972 in the amount of $103,532.52 and asserted an addition to tax for fraud pursuant to section 6653(b), [1] in the amount of $51,766.26. [2] The issues before us are: (1) whether petitioner George Gordon Liddy diverted any funds received, as director of an intelligence operation, to his personal use in 1972; (2) whether petitioner Frances Purcell Liddy is entitled to the benefit of the "innocent spouse" provisions pursuant to sec. 6013(e), should it be determined that a deficiency in income tax exists; and (3) whether the addition to tax for fraud was properly asserted. FINDINGS OF FACT Some of the facts have been stipulated and are so found. *527 The stipulation of facts, together with the exhibits attached thereto, is incorporated herein by this reference. Petitioners, George Gordon Liddy and Frances Purcell Liddy, were residents of Oxon Hill, Maryland at the time of filing their petition in this case. [3] They filed a joint Federal income tax return for the year 1972, which reflected a cash receipts and disbursements method of accounting. Petitioner is well known for his role in the so-called "Watergate" affair. He was director of an intelligence operation, the purpose of which was to acquire information with respect to the capabilities and intentions of the prospective Democratic opponents to then-President Richard M. Nixon. As director, petitioner's responsibilities were to organize and deploy the intelligence effort for the 1972 Presidential campaign. Petitioner was recruited to carry on this activity in October 1971 by John W. Dean III, Counsel to the President. At that time petitioner was on the White House Staff employed as a staff assistant to the President. He accepted Mr. Dean's offer only after *528 receiving assurance that John D. Ehrlichman, Assistant to the President for Domestic Affairs, and John N. Mitchell, Attorney General of the United States, wanted him to assume these duties. Due to the potential illegal nature of large portions of the intelligence operations, petitioner needed a "cover" that would not cast suspicion on his role as the director of intelligence efforts. To accomplish this, petitioner became general counsel to the Committee to Re-Elect the President (hereinafter CREEP) in December 1971. Petitioner continued his employment with CREEP until April 1972 when he left to become general counsel to the Finance Committee to Re-Elect the President (hereinafter FCREEP). Petitioner's total combined salary while employed at CREEP and FCREEP was $2,500 per month, or $30,000 per annum. While CREEP and FCREEP were two separate and distinct committees, they were related in the sense that the purpose of CREEP was to get President Nixon re-elected and FCREEP's objective was to raise the necessary funds for that re-election. Petitioner's superiors at CREEP were Jeb Stuart Magruder, deputy director of CREEP, and Mr. Mitchell, and his superior at FCREEP was Maurice Stans. *529 It should be mentioned that, at all times, petitioner's supervisors with respect to his intelligence activities were Mr. Magruder and Mr. Mitchell. Mr. Stans had no authority over petitioner with respect to the intelligence operations, and, in fact, was not aware of those activities. Pursuant to Mr. Magruder's authorization, funds were made available for the intelligence operations. These funds were used to recruit personnel, acquire the necessary surveillance equipment, and organize the intelligence activities. When employed at CREEP, petitioner received these funds in cash from Bart Porter, who required petitioner to acknowledge receipt of these amounts in writing. Petitioner returned any unused cash, along with receipts for expenditures, to Mr. Porter in a sealed envelope. After petitioner came to FCREEP, funds were distributed to him by Hugh Sloan. While Mr. Sloan required him neither to acknowledge receipt of the money nor to justify his expenditures, petitioner did keep receipts of the expenditures made in furtherance of the intelligence activities. Generally, funding and expenditures for these activities were made pursuant to a flow chart and a budget, [4] which had been *530 prepared by petitioner and E. Howard Hunt. They determined which items went into the budget, which was comprised of three categories of expense: equipment, salaries, [5] and activities. The budget had been approved by Mr. Mitchell at a meeting with Mr. Magruder. The following schedule shows the total receipts and expenditures for the year 1972 as testified to by petitioner and which we accept as facts: [6]
Receipt of funds in 1972: Mr. Porter -- cash
[7] $ 25,000 Mr. Sloan -- cash
170,000 Mr. Sloan -- travelers checks
[8] 50,000 Mr. Sloan -- checks
[8] 114,000 Mr. Ulasewitz -- cash
8,000 Mrs. Hunt --cash
19,000 Total Receipts
$386,000
Disbursement of funds in 1972: Redemption of checks
[8] $111,500 Redemption of travelers checks,
which were turned in
[8] 50,000 Cost to cash travelers checks
and checks
[8] 2,500 Mr. McCord
91,000 Mr. Hunt's salary
18,000 Mr. Hunt's contingency fund
10,000 Additional payment to Mr. Hunt
1,000 Mr. Larue
8,500 Mr. Jackson, Esq.
500 Charts
300 Kennedy Photos
500 Cartoons
300 Convention site plans
500 Segretti printing
500 K Street lease
2,200 Mr. Balman
1,000 Recruitment for Miami Convention
2,270 "Watergate" I
8,000 "McGovern Operation"
8,000 "Hoover Operation"
2,000 Hoover funds returned to Mr. Porter
1,000 Cameras
600 Film
100 Additional tools
200 Gregory expense
4,000 McGovern typewriter
600 Shredded cash
1,300 Legal fees
17,500 Mr. Jackson
1,000 Demonstration in Miami
1,000 Less expenses paid for in 1971
(5,500)
Total Expenses
340,370
Unaccounted For Funds
$ 45,630
*531 The day-to-day operation of the intelligence activities was controlled by petitioner, and, because of the nature of these activities, he did not report on a regular basis its progress to his superiors. On one occasion he did report *532 directly to Mr. Mitchell, and on two or three other occasions he reported to Mr. Magruder. The intelligence operations ceased shortly after the June 1972 Watergate break-in, which was discovered by the authorities while in progress. Following this discovery, petitioner destroyed all records within his possession with respect to the intelligence operation and recommended to Mr. Porter that he do the same. Destruction of the records was considered necessary by petitioner to prevent their discovery by the authorities, who were conducting an investigation of the "Watergate" incident. It was petitioner's belief that discovery of these records could have had an adverse impact on President Nixon's re-election. As a result of his "Watergate" involvement, petitioner's employment and salary with FCREEP were terminated. He was arrested and subsequently prosecuted for various offenses before Judge John J. Sirica of the United States District Court for the District of Columbia. At trial, he refused to testify because he believed that his testimony could have had an adverse effect on President Nixon's re-election campaign. Ultimately, he was convicted of several criminal offenses, and as of *533 January 1973 commenced serving time in prison. On April 12, 1977 President Jimmy Carter commuted petitioner's prison sentence, but did not reduce the $40,000 criminal fine, which had been imposed upon him for his "Watergate" activities. On September 6, 1977, after swearing under oath that he had no funds, petitioner was released from prison. During petitioner's incarceration, Mrs. Liddy was employed as a school teacher in the District of Columbia public schools and used her income to support herself and their five children. She supplemented her income by receiving fees for magazine articles, interviews, and the proceeds from the sale of her home in Poughkeepsie, New York, which she had inherited from her parents. [9]
Despite her teacher's salary and other income, Mrs. Liddy had a difficult time supporting her family. She was delinquent in making mortgage, automobile, credit card, and utility payments. In fact, the Liddys' gas, electric, water, and telephone services at their residence were shut off from time to time for nonpayment, and Mrs. Liddy's two credit cards were also canceled *534 for nonpayment. These significant adverse changes in financial condition had an effect on the Liddys' children. All of the children obtained part-time jobs to help out, and they also qualified for, and went on, the school lunch program for needy students. The children also started wearing used clothing, which the neighbors had donated. Petitioner and Mrs. Liddy prepared their joint Federal income tax return for 1972. The return showed gross income in the amount of $31,476.41, which Mrs. Liddy thought accurately reflected their income for that year. Since their bank statements for 1972 did not show any unusual or large deposits or transactions, and they did not maintain a lifestyle in excess of that appropriate to the income reported, Mrs. Liddy was not alerted to any possibility that petitioner may have omitted some items from income. In his statutory notice of deficiency, respondent maintained that during the year ended December 31, 1972, petitioners received $374,300 from various persons and the Finance Committee to Re-Elect the President. Respondent determined that of the total amount, $197,500 was disbursed by petitioners on behalf of the Finance Committee to Re-Elect the *535 President and that the balance of $176,800 was taxable income. In addition, respondent determined that all or part of the underpayment of tax required to be shown on the return for the tax year ended December 31, 1972 was due to fraud. Consequently, the 50-percent addition to the tax was charged only against George Gordon Liddy for that year, as provided by section 6653(b). OPINION As a preliminary matter, and based upon evidence then in the record, the Court granted a Motion to Suppress filed by petitioner with respect to all material obtained by respondent from the grand jury records gathered as a result of that jury's investigation of the so-called "Watergate" affair. As it developed at the trial on the merits, respondent proffered additional evidence with respect to the circumstances of his access to grand jury material that would have caused the Court to reconsider its previous order had any such material from that source in fact been offered in evidence by respondent. However, since no such evidence was offered, the matter is deemed moot, and the Court finds it unnecessary to reconsider the aforementioned order. Having addressed this preliminary matter, we will now focus *536 our attention on the issues before us. It is well established that the mere receipt and possession of money does not by itself constitute gross income. Lashells' Estate v. Commissioner,208 F.2d 430, 435 (6th Cir. 1953). Thus, the recipient of borrowed money does not include his receipt of those funds in income. Gross income, as used in section 61(a), means the accrual of some gain, profit, or benefit to the taxpayer. This requirement of gain, however, must be read in its statutory context, and not every benefit received by the taxpayer will constitute gross income to him. In determining what constitutes gross income, mere dominion and control over money and property will not necessarily be decisive. Rather, all relevant facts and circumstances must be considered. Lashells' Estate v. Commissioner,supra at 435. This concept of gross income was elaborated upon by the Supreme Court when they held that a taxpayer who receives amounts under a claim of right and without restrictions with respect to its disposition must include such amounts in gross income. North American Oil Consolidated v. Burnet,286 U.S. 417, 424 (1932). The existence of a claim of right is negated, however, when *537 a taxpayer is required to make prompt payments of amounts received, even if such payments are made in the absence of an enforceable obligation. Lashells' Estate v. Commissioner,supra at 435. Therefore, amounts received over which a taxpayer is acting as a mere agent or conduit are not required to be reported as income. Goodwin v. Commissioner,73 T.C. 215, 230 (1979); Diamond v. Commissioner,56 T.C. 530, 541 (1971), affd. 492 F.2d 286 (7th Cir. 1974). Respondent contends that petitioner received funds in the amount of $176,800, while involved in the "Watergate" affair and related illegal intelligence activities, which he diverted to his personal use. Thus, respondent maintains that this amount constitutes income to petitioners, George Gordon Liddy and Frances Purcell Liddy. Petitioners claim that George Gordon Liddy acted as a mere conduit in receiving and disbursing the funds in issue. They argue that this amount, therefore, was properly excluded from their 1972 tax return because it did not constitute income to them. Petitioners have the burden of proof on this issue, Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a), [10] and its resolution turns upon whether we choose to *538 believe petitioner's explanation that he was acting as a conduit when handling the funds in issue. He testified at trial that, in general, he retained no portion of the funds in question, and that no portion thereof was used for his personal benefit. Petitioner further testified that he received funds totaling $386,000, and he was able to give a reasonably detailed accounting of how he spent $340,370 of these funds. Petitioner, however, was not able to give any detailed explanation with respect to the remaining $45,630 in funds he received. Respondent proffered no evidence to contradict petitioner's testimony or to indicate that the events were other than as explained. While it is unfortunate that there was not any documentation for these expenditures, given the illegal nature of the intelligence operation, it is plausible that petitioner would have destroyed all records within his possession once the authorities discovered the "Watergate" and related activities. Although we obviously do not condone petitioner's involvement in illegal activities, we found him to be a credible witness *539 with respect to the issue at hand. He was frank in describing how he obtained the funds for the intelligence operation, and was able to give a reasonably detailed accounting regarding most of his expenditures. In a rather odd twist, petitioner's testimony was all the more believable and plausible by reason of his bizarre view of right and wrong. Simply put, the old adage, the end justifies the means, seems a fair description of his approach to life. Accordingly, we find that petitioner acted as a conduit with respect to his receipt of $340,370 in funds since he was able to explain in sufficient detail how those funds were spent. He was not able, however, to explain adequately what he did with the other $45,630 in funds that he received. His general statement that these funds were also expended is insufficient to carry his burden, and we therefore find that this amount was diverted by him for his personal use and thus constitutes income. On brief, respondent also asserts that Liddy's receipt of "Watergate" funds constituted gross income and that petitioners should not be allowed to claim any business expenses in addition to those previously allowed by him. Respondent justifies *540 this position on two alternative grounds: (1) petitioners failed to substantiate the expenditures paid with respect to the intelligence activities because the necessary records for maintaining deductions for ordinary and necessary expenses from gross income were not kept; and (2) deductions for these illegal activities are prohibited by section 162(c)(2). Neither one of these positions was clearly set forth in either respondent's notice of deficiency or answer to petition. The only issue respondent addressed at trial was whether petitioner, George Gordon Liddy, had diverted funds received from his employer to his personal use. We will not address these late issues, because to do so would allow respondent, in effect, to change his position subsequent to trial without affording petitioners the opportunity to refute these contentions. Having found that a deficiency exists for 1972 because petitioner diverted funds to his personal use, the next issue to decide is whether Mrs. Liddy should be relieved from the resultant income tax liability. As a general rule, married taxpayers filing joint returns are jointly and severally liable for the tax due on their combined incomes. Sec. 6013(d)(3). *541 An exemption is provided, however, by the "innocent spouse" provisions of section 6013(e). [11] Under section 6013(e), a taxpayer filing a joint return is relieved of liability which is due to a substantial understatement [12] of tax if (1) the substantial understatement of tax is attributed do grossly erroneous items [13] *542 of the taxpayer's spouse; (2) the taxpayer did not know and had no reason to know of the substantial understatement; and (3) considering all the facts and circumstances, it would be inequitable to hold the taxpayer liable for the deficiency. [14]
The burden of proving each of the above elements is on Mrs. Liddy. Welch v. Helvering,supra;Adams v. Commissioner,60 T.C. 300, 303 (1973); Rule 142(a). It is clear from our finding, since petitioner had unreported income in the amount *543 of $45,630, that there was a substantial understatement of tax attributed to grossly erroneous items. Thus, we will direct our examination to the other two requirements that Mrs. Liddy must satisfy in order to be relieved of liability. In determining whether Mrs. Liddy actually knew, or had reason to know, of the substantial understatement we must necessarily rely on her testimony. Her testimony, which we find to be credible, was that she believed the joint return filed reflected all of the income that she and petitioner had earned in 1972. Since respondent did not offer any evidence to contradict or cast suspicion upon her testimony, we find that Mrs. Liddy did not know of the substantial understatement of tax when she signed the return. Furthermore, we do not believe that Mrs. Liddy had reason to know of the substantial understatement. There is not a scintilla of evidence indicating that the Liddys maintained a lifestyle or standard of living in excess of that appropriate to the income reported by them on their 1972 return. In addition, the Liddys, bank statements for 1972 show no unusual or large deposits or transactions. While it is true that Mrs. Liddy was aware of petitioner's *544 "Watergate" and related intelligence activities when the 1972 return was prepared and signed, it does not follow that she should have been alerted to the fact that petitioner might have diverted funds to his personal use. Given petitioner's refusal to testify at his criminal trial with respect to his involvement in "Watergate," we believe it probable that he would not have informed Mrs. Liddy about any diversion of funds. Finally, we must decide whether it would be inequitable to hold Mrs. Liddy liable for the deficiency. This determination is to be made after considering all the facts and circumstances, and whether Mrs. Liddy significantly benefited directly or indirectly from the substantial understatement continues to be a factor to take into account. Our review of the evidence indicates that it would be inequitable to hold Mrs. Liddy liable for the deficiency. The record demonstrates that Mrs. Liddy did not benefit from petitioner's diversion of funds. As mentioned earlier, there was no evidence that the Liddys maintained a lifestyle or standard of living in excess of that appropriate to the income reported on their 1972 return. In the subsequent years, when petitioner was *545 incarcerated, their standard of living actually decreased because Mrs. Liddy had difficulty supporting herself and her five children on her teacher's salary and supplemental income. Even though petitioner contributed some money towards ordinary support, these funds that he provided were not traceable to the "Watergate" funds. [15]
Thus, Mrs. Liddy meets all the requirements of section 6013(e) for the year 1972 and is entitled to the relief from liability provided thereunder. [16]
The remaining issue for our resolution is whether petitioner, George Gordon Liddy, is liable for the addition to tax under section 6653(b) for fraud. The burden of proving fraud is on respondent, and he must do so by clear and convincing evidence. Sec. 7454(a); Stone v. Commissioner,56 T.C. 213, 220 (1971); Rule 142(b). This burden is met if it is shown that the taxpayer intended to evade taxes known to be owing by conduct intended to conceal, mislead or otherwise *546 prevent the collection of taxes, and that there is an underpayment of tax. Stoltzfus v. United States,398 F.2d 1002, 1004 (3d Cir. 1968), cert. denied 393 U.S. 1020 (1969); Rowlee v. Commissioner,80 T.C. 1111, 1123 (1983). The existence of fraud is a question of fact to be resolved upon consideration of the entire record. Rowlee v. Commissioner,supra at 1123; Gajewski v. Commissioner,67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978). fraud will never be presumed. Beaver v. Commissioner,55 T.C. 85, 92 (1970). Since fraud can seldom be established by direct proof, the requisite intent may be inferred from a showing by respondent that petitioner's conduct was intended to conceal, mislead, or otherwise prevent the collection of taxes that petitioner knew or believed he owed. Stoltzfus v. United States,supra;Professional Services v. Commissioner,79 T.C. 888, 930 (1982). Since respondent's assertion of fraud requires an inquiry into the taxpayer's frame of mind, a single act or omission seldom demonstrates the necessary fraudulent intent. Rather, the existence of the requisite fraudulent intent must generally be determined by surveying a taxpayer's *547 entire course of conduct. Stone v. Commissioner,supra at 223-224; Stratton v. Commissioner,54 T.C. 255, 284 (1970). Respondent argues that petitioner understated his income for 1972 with an intent to evade taxes. He asserts that his argument is supported by (1) petitioner's educational and professional background, (2) his grotesque view of right and wrong, and (3) his destruction of all records within his possession with respect to his intelligence activity expenditures. As mentioned earlier, petitioner's explanation of why he destroyed the records was plausible, given the discovery of "Watergate" and the related intelligence activities by the authorities. With respect to his educational and professional background, as well as his amoral approach to matters of right and wrong, we fail to see how these generalities establish the requisite intent necessary to find fraud. No instances of specific conduct demonstrating an intent by petitioner to conceal, mislead, or otherwise prevent the collection of tax were shown by respondent. In fact, respondent offered no evidence at trial with respect to this question, and thus fell far short of carrying his burden of proof on this issue. *548 Therefore, we find that petitioner is not liable for the addition to tax under section 6653(b). Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect for the taxable year in issue. ↩
2. This addition to tax was asserted solely against George Gordon Liddy.↩
3. For convenience, we will generally refer to George Gordon Liddy as petitioner and Frances Purcell Liddy as Mrs. Liddy.↩
4. Mr. Porter distributed funds to petitioner prior to the budget being approved and Mr. Sloan distributed funds to petitioner after its approval. ↩
5. It should be noted that no additional salary was budgeted for petitioner for his involvement in the intelligence operation. ↩
6. Because of the occurrence of unanticipated events, some of the receipts and expenditures were not contained in the original budget. Examples of such events include the expenditures paid for the "Hoover Operation" and for the demonstration in Miami. ↩
7. Mr. Porter gave petitioner a total of $30,000 in cash, but $5,000 of this amount was distributed to petitioner in 1971. ↩
8. Petitioner received these checks from FCREEP, which he cashed for the committee. Petitioner testified that the actual receipt of these travelers checks was in the range of $50,000 to $100,000. The actual amount is irrelevant, however, since petitioner's receipt of these funds is entirely negated by his disbursement of them.↩
9. Occasionally, petitioner was able to contribute money earned from magazine articles and interviews.↩
10. unless otherwise stated, all rule references are to the Tax Court Rules of Practice and Procedure.↩
11. Section 6013(e)↩ was amended by the Tax Reform Act of 1984, with retroactive application to all taxable years to which the Internal Revenue Code of 1954 and of 1939 applies. See Pub. L. 98-369, sec. 424, 98 Stat. 801; H. Rept. No. 98-432, Pt. 2 (March 5, 1984) 1501, 1503. 12. For purposes of sec. 6013(e), substantial understatement generally means the excess of the amount of the tax required to be shown on the return for the taxable year over the amount of the tax imposed which is shown on the return, where such excess exceeds $500. See secs. 6013(e)(3) and 6661(b)(2)(A). See also sec. 6013(e)(4)↩. 13. Grossly erroneous items includes claims for deductions, basis, or credits, as well as omitted income. See sec. 6013(e)(2)(A) and (B)↩. Under prior law, a taxpayer was relieved from the liability of tax attributable to omissions from gross income of the other spouse, if the omissions met certain requirements. 14. Sec. 6013(e)(1)(C), prior to its amendment, provided that, in determining whether it would be inequitable to hold the other spouse liable for the deficiency, consideration was to be made with respect to whether the other spouse significantly benefited directly or indirectly from the items omitted from gross income. While this section, as amended, does not specifically require that the determination, of whether it would be inequitable to hold the innocent spouse liable, include the consideration of whether such spouse benefited from the erroneous item, that factor should continue to be taken into account. See H. Rept. No. 98-432, Pt. 2 (March 5, 1984), supra↩ at 1502.
15. In addition, the term "benefit," as applied in section 6013(e), does not include ordinary support of the innocent spouse. Allen v. Commissioner,61 T.C. 125, 131↩ (1973).
16. It should be mentioned that respondent did not argue this issue on brief.↩